Adam M. Apton (SBN 316506)
LEVI & KORSINSKY, LLP
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel.: (213) 985-7290
aapton@zlk.com

Brenda Szydlo (*admitted pro hac vice*)
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, NY 10016
Tel.: (212) 661-1100
bszydlo@pomlaw.com

*Counsel for Plaintiffs and*
*Co-Lead Counsel for the Class*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL C. PIZZUTO, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HOMOLOGY MEDICINES, INC., ARTHUR O. TZIANABOS, W. BRADFORD SMITH, ALBERT SEYMOUR, THERESA MCNEELY, and JOHN DOES 1-10,<br><br>Defendants. | Case No. 2:22-cv-01968-FLA-JPR<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Michael C. Pizzuto and Lead Plaintiffs Scott Boyd, Kasey Kahne, and Jason Rofeh (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their attorneys, allege the following based upon personal knowledge as to Plaintiffs' own acts, and upon information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys. Such investigation included a review of Defendants' public statements and announcements, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Homology Medicines, Inc. ("Homology"), securities analysts' reports, news stories, and circumstances alleged herein.

Plaintiffs believe that additional substantial evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    Plaintiffs bring this class action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, on behalf of themselves and all other persons or entities who purchased or otherwise acquired Homology securities between March 12, 2020 and February 18, 2022, inclusive (the "Class Period"), and were damaged thereby.

2.    Homology, a biopharmaceutical company that specializes in genetic therapeutics, conducted a clinical trial that looked initially to be a huge success. However, the trial data demonstrated that Homology's drug was largely ineffective and highly toxic to the study participants. Defendants did not disclose this negative information but instead made positive statements that directly contradicted it. The truth about Defendants' deception came to light through partial disclosures about the clinical data and, ultimately, the decision by the U.S. Food & Drug Administration

Amended Class Action Complaint                    Case No. 2:22-cv-01968-FLA (JPRx)

("FDA") to issue a "clinical hold" and shutdown Homology's trial pending modifications to the study protocol.

3.      The drug at issue in this case is HMI-102. It was a gene therapeutic designed to treat phenylketonuria ("PKU"), which is a genetic condition that can lead to excessive phenylalanine levels and brain damage. In June 2019, Homology commenced its clinical trial for HMI-102, which was referred to as the "pheNIX" trial. The pheNIX trial consisted of two parts: the first part was a "dose-escalation" phase where Homology would test a low-dose, mid-dose, and high-dose of HMI-102 to identify a correct dosage; and then a second part called the "dose-expansion" phase in which Homology would test HMI-102 at a determined dose on a broader population. The pheNIX study was integral to Homology's success given its potential to be used as a registrational trial with the FDA, meaning that Homology could rely on it when applying for permission to commercialize HMI-102.

4.      By December 2019, Homology was well into the dose-escalation phase of the trial, having administered HMI-102 to patients at both the low- and mid-doses. The data at that point, however, was equivocal at best. The low-doses failed to demonstrate an effective response, or "dose-response effect," in terms of lowering patient phenylalanine levels. The mid-dose data provided slightly better results but was not determinative, according to analysts who were following the company at the time. Thus, the success of HMI-102 and the pheNIX trial rested squarely on the outcome of the high-dose testing that had yet to be done.

5.      In March 2020, Homology administered its first high-dose of HMI-102. "Patient 5," as she later came to be known, did not demonstrate an effective response. Instead, her phenylalanine levels "[kept] steady" at "very high" levels, thereby demonstrating that HMI-102 was not effective at the high-dose. Moreover, Patient 5 suffered severe and dangerous levels of liver toxicity after taking HMI-102, necessitating steroid intervention that was materially over and above what

Amended Class Action Complaint                    Case No. 2:22-cv-01968-FLA (JPRx)

Homology's study protocol prescribed both in terms of length and strength of treatment. Thus, in addition to the high-dose of HMI-102 not working, it was also potently toxic.

6.     Patient 5 described her HMI-102 results in what was initially a public post on Facebook on April 15, 2020. Homology quickly took note of the post and, within a few hours of its publication, the post was removed from public view. Homology's Chief Communications Officer then began contacting sell-side analysts to assure them that "[n]othing fundamental changed" for Homology, HMI-102, or the pheNIX trial in an attempt to conceal Patient 5's negative study data. These sell-side analysts, including those from well-known investment banks such as Oppenheimer and Baird, accepted Homology's representations and passed along management's assurances about the study and its data. For example, Baird told investors that, "Having spoken with [Homology] management, we continue to favor the risk/reward dynamic for the mid-20 pheNIX update and thus reiterate our [Homology] Outperform rating and $32 price target."

7.     In November 2020, after making numerous false representations about HMI-102's efficacy and safety profile, Homology disclosed the pheNIX data from the dose-escalation phase of the trial. The data confirmed that HMI-102 was less safe and less effective than Defendants had previously let on, yet Homology proclaimed that it still supported continuing the pheNIX trial and progressing to the dose-expansion phase where the company would test two doses (a mid-dose and high-dose). Homology also noted that it would be changing the study protocol based on information learned from the dose-escalation phase in order to modify the steroid regimen given to patients along with their doses of HMI-102.

8.     Analyst reports were mixed following Homology's presentation of the pheNIX data. While the data was initially viewed negatively by the market, Oppenheimer, for example, told investors that the "sell-off" in Homology's stock was

Amended Class Action Complaint                    Case No. 2:22-cv-01968-FLA (JPRx)

"unjustified" in light of the fact that pheNIX would be progressing into the dose-expansion phase and, potentially, to a registrational trial for marketing approval. Chardan Capital Markets, another analyst firm, referred to the pheNIX data as "not yet clear" and questioned whether HMI-102 would ultimately demonstrate a clinical benefit.

9.      Homology proceeded with the pheNIX study and the dose-expansion phase of the trial. Defendants initially told the market they would provide data from the study in late-2021 but ultimately extended that timeframe to the back half of 2022. In the absence of that data, Defendants instead repeatedly represented to investors that HMI-102 was "well-tolerated" with the new steroid regimen and showing "clinically meaningful reductions in Phe [phenylalanine] levels" at the selected doses. Defendants also managed to secure a massive influx of capital during this time, negotiating a deal with Oxford Biomedica plc for an investment of $130 million that successfully extended Homology's "operational runway" by two years into the future all the way to the first quarter of 2023, according to analysts.

10.      The market soon came to find out that Defendants had been lying to them. On February 18, 2022, Homology announced that the FDA would be issuing a clinical hold on the pheNIX trial and shutting it down indefinitely unless and until updates were made to the protocol to address critical safety concerns. In particular, the FDA had focused on Homology's steroid regimen and its ineffectiveness in terms of preventing toxicity in HMI-102 patients. Defendants knew that their steroid regimen for the dose-expansion phase was insufficient, as evidenced by *inter alia* Homology's use of an updated course of treatment in another one of the company's clinical trials, but nevertheless concealed the risks that it posed to the development of HMI-102, the pheNIX trial, and investors generally.

11.      Between the start of the Class Period and the ultimate revelation concerning the FDA's clinical hold, Homology's stock price declined from $17.91

Amended Class Action Complaint                    Case No. 2:22-cv-01968-FLA (JPRx)

per share all the way down to $2.60 per share representing a market capitalization loss of over 85% or over $500 million. Defendants are liable for the losses that investors sustained as a result and should be held accountable under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5.

## II.    JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act of 1934, 15 U.S.C. §78aa.

14.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391.

15.    Defendants' false and materially misleading statements entered into and caused damages to Class members in this Judicial District, including Plaintiff Michael C. Pizzuto who resides in Los Angeles County.

16.    Plaintiff Michael C. Pizzuto commenced this action in this Judicial District. Mr. Pizzuto resides and works in Los Angeles County and, consequently, purchased Homology securities during the Class Period while in this Judicial District. During the Class Period, Homology also sent communications to Mr. Pizzuto, while within this Judicial District, including communications related to Homology's SEC filings.

17.    Relevant and material information to the claims alleged herein exists and resides in this Judicial District. Homology's co-founder, Saswati Chatterjee, Ph.D., resides in Los Angeles County. Dr. Chatterjee's research laboratory is located at the City of Hope Medical Center within Los Angeles County. Homology's lead drug candidate, HMI-102, was developed by Dr. Chatterjee at her research lab in Los Angeles County. Upon information and belief, Dr. Chatterjee's research and data concerning the development of HMI-102 is located within this Judicial District.

18.     Homology holds patents and pending patent applications concerning its drug candidates, including HMI-102. These patents are exclusively and co-exclusively licensed to Homology by agreement from the City of Hope Medical Center and the California Institute of Technology, both of which are located within Los Angeles County.

19.     Homology's license agreements with the City of Hope Medical Center and the California Institute of Technology require, *inter alia*, Homology to provide and/or make available records relating to the commercialization of the licensed technology, including any drug candidates developed by Homology such as HMI-102. In its licensing agreements with the City of Hope Medical Center and the California Institute of Technology, Homology consented to jurisdiction within this Judicial District.

20.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

### A.   Plaintiffs

21.     Plaintiff Michael C. Pizzuto purchased Homology securities at artificially inflated prices during the Class Period and was damaged as a result. Mr. Pizzuto's Certification and accompanying list of transactions in Homology securities is incorporated herein by reference. *See* ECF Nos. 1-1, 1-2.

22.     Lead Plaintiff Scott Boyd purchased Homology securities at artificially inflated prices during the Class Period and was damaged as a result. Mr. Boyd's Certification and accompanying list of transactions in Homology securities is incorporated herein by reference. *See* ECF No. 13-3.

7

23. Lead Plaintiff Kasey Kahne purchased Homology securities at artificially inflated prices during the Class Period and was damaged as a result. Mr. Kahne's Certification and accompanying list of transactions in Homology securities is incorporated herein by reference. *See* ECF No. 13-3.

24. Lead Plaintiff Jason Rofeh purchased Homology securities at artificially inflated prices during the Class Period and was damaged as a result. Mr. Rofeh's Certification and accompanying list of transactions in Homology securities, including the transactions for which Mr. Rofeh is acting as authorized assignee, is incorporated herein by reference. *See* ECF No. 19-4.

25. Plaintiff Pizzuto and Lead Plaintiffs Boyd, Kahne, and Rofeh are referred to herein as the "Plaintiffs."

**B.    Homology Medicines**

26. Defendant Homology is a Delaware corporation with principal executive offices located at One Patriots Park, Bedford, Massachusetts.

27. Homology's securities trade in an efficient market in the U.S. on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "FIXX".

**C.    Individual Defendants**

28. Defendant Arthur O. Tzianabos ("Tzianabos") has served as Homology's President, Chief Executive Officer, and Director at all relevant times.

29. Defendant W. Bradford Smith ("Smith") has served as Homology's Chief Financial Officer and Treasurer at all relevant times.

30. Defendant Albert Seymour ("Seymour") has served as Homology's Chief Scientific Officer at all relevant times.

31. Defendant Theresa McNeely ("McNeely") has served as Homology's Chief Communications Officer at all relevant times.

32. Defendants Tzianabos, Smith, Seymour and McNeely are sometimes referred to herein as the "Individual Defendants."

33.     The Individual Defendants possessed the power and authority to control the contents of Homology's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Homology's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Homology, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

34.     Defendants John Does 1-10 are Homology employees and/or agents acting for the benefit of Homology that disseminated the false and/or materially misleading statements alleged herein to various analysts, reporters, and news outlets which, in turn, published the false and/or materially misleading information to Plaintiffs and other members of the Class.

### D.     Relevant Non-Parties

35.     Saswati Chatterjee, Ph.D., created Homology's gene editing and gene therapy technologies while researching "adeno-associated virus vectors" or "AAVHSCs". She is a Professor of Virology at the Beckman Research Institute at the City of Hope Medical Center in Duarte, California, where she directs the adeno-associated virus gene therapy group. Dr. Chatterjee published the results of her AAVHSCs research in the journal *Proceedings of the National Academy of Sciences* under the title "Stem cell-derived clad F AAVs mediate high-efficiency homologous recombination-based genome editing." Dr. Chatterjee resides and/or works in Los Angeles County, California.

36.     City of Hope Medical Center is the medical facility where Dr. Chatterjee developed the gene editing and gene therapy technology underlying Homology's drug candidates. City of Hope Medical Center licenses use of its patents to Homology for the development and commercialization of the technology used in HMI-102. City of Hope Medical Center is located within Los Angeles County, California.

37.     California Institute of Technology licenses use of its patents to Homology for the development and commercialization of the technology used in HMI-102. California Institute of Technology is located in Los Angeles County, California.

38.     BTIG, LLC ("BTIG") served as the underwriter for Homology's secondary offering held on or around April 8, 2021. Pursuant to the underwriting agreement between BTIG and Homology dated April 6, 2021, BTIG purchased the entirety of the offering from Homology, which included 6,596,306 shares of Homology's common stock plus an additional allotment of 989,445 shares of Homology's common stock subject to BTIG's option. Upon information and belief, BTIG conducted due diligence into Homology's operations and representations prior to serving as the underwriter for the secondary offering, including Homology's representations concerning the pheNIX clinical trial and HMI-102. BTIG's office located in San Francisco, California, provided the underwriting services in connection with the offering.

39.     Oxford Biomedica Solutions LLC ("Oxford Biomedica") entered into a collaboration agreement with Homology in or around January 28, 2022. Pursuant to the terms of the collaboration agreement, Oxford Biomedica provided Homology with $180 million in exchange for 180,000 units in a newly formed joint venture created for the purpose of developing and manufacturing Homology's adeno-associated virus vector therapeutics, including $50 million in cash in connection with the closing of the transaction. Oxford Biomedica is located in Oxford, England.

Amended Class Action Complaint                    Case No. 2:22-cv-01968-FLA (JPRx)

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Homology's Gene Therapy Technology.

40.     Homology is a biopharmaceutical company that specializes in gene therapy. Gene therapies are treatments designed to cure diseases by altering or correcting the underlying genetic cause of the disease instead of, for example, using drugs or surgery.

41.     The most commonly known form of gene therapy is "Clustered Regularly Interspaced Short Palindromic Repeats" or "CRISPR." It works by inserting an enzyme into a patient's DNA that then breaks or disrupts the patient's DNA to eliminate the patient's genetic disorder.

42.     Instead of CRISPR, Homology's gene therapies utilize "adeno-associated virus vectors" or "AAVHSCs" as the delivery mechanism for its therapeutics. AAVHSCs therapies, if successful, stand to be safer and more effective than CRISPR therapies because they do not insert enzymes into the patient's DNA and, therefore, do not break DNA strands in the process of curing the patient. Instead, Homology's AAVHSCs treatments replicate diseased genes with a functional or healthy version that is then incorporated into the patient via a virus when his or her cells divide. Thus, Homology's treatments do not "break" the patient's genetic code in the process, which is what occurs with CRISPR; instead, Homology's AAVHSCs treatment are safer, similar to the benefits of performing a surgery without a scalpel.

43.     The AAVHSCs technology was developed by Dr. Chatterjee at the City of Hope Medical Center. In May 2017, Dr. Chatterjee presented her AAVHSCs technology at the annual American Society of Gene & Cell Therapy conference, and claimed that her research lab had been able to identify viruses capable of altering as many as 50% of cells in controlled testing. Dr. Chatterjee then began identifying viruses and filing patents on them for use in gene therapies for actual patients.

11

44.    Homology uses Dr. Chatterjee's AAVHSCs technology in its drug candidates with permission from the City of Hope Medical Center pursuant to a license agreement. Homology also relies upon licenses from the California Institute of Technology for the technology that it incorporates into its drug candidates. In exchange for these licenses, Homology is subject to significant payment obligations and royalties on product sales, among other things.

**B.    HMI-102 and the pheNIX Study.**

45.    Homology's lead drug candidate during the Class Period was HMI-102. HMI-102 was a gene therapy intended to treat phenylketonuria ("PKU"). PKU is a genetic disorder that leads to the build-up of an amino acid called phenylalanine. PKU is caused by a disorder in the phenylalanine hydroxylase gene that ordinarily creates the enzyme necessary to break down phenylalanine. Too much phenylalanine in the body can lead to brain damage.

46.    Federal law requires pharmaceutical companies to obtain permission from the FDA before marketing a drug to the public and, in turn, generating revenue from sales. To obtain permission, a company (or sponsor) must demonstrate that the drug is safe, effective, and that its benefits outweigh its risks. This is typically done through clinical trials and the submission of a New Drug Application or NDA. All drugs currently marketed within the United States were, at some point, the subject of an approved NDA.

47.    A properly submitted NDA provides the FDA with all pertinent information about the drug, including data and statistical analyses sufficient to determine whether: (1) the drug is safe and provides the benefits it purports to; (2) the benefits of the drug outweigh its risks; (3) the drug's proposed labeling is appropriate and what it should contain; and (4) the methods used in manufacturing the drug and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity. Although safety and efficacy are particularly

1  important in the FDA's assessment, each of these issues is independently critical to
2  the agency's ultimate approval decision.

3      48.     In order to meet these standards, drug developers typically subject a drug
4  candidate to a series of clinical trials designed to accumulate the data required to
5  submit a successful NDA. Phase 1 clinical trials typically evaluate an investigational
6  drug's safety and dosage tolerance. Phase 2 clinical trials: (1) usually involve larger
7  patient populations; (2) evaluate dosage tolerance and appropriate dosage; (3) identify
8  possible short-term adverse effects and safety risks; and (4) provide a preliminary
9  evaluation of the efficacy of the drug for specific indications. Finally, Phase 3 clinical
10 trials test for efficacy and safety in an even further expanded patient population. Phase
11 3 trials also usually involve comparison with placebo, and are intended to establish
12 the overall risk-benefit profile of the product and provide an adequate basis for
13 physician labeling.

14     49.     On June 10, 2019, Homology launched its first clinical trial for HMI-102
15 titled "A Phase 1/2 Open-Label, Randomized, Concurrently-Controlled, Dose
16 Escalation Study to Evaluate the Safety and Efficacy of HMI-102 in Adult PKU
17 Subjects With PAH Deficiency." Homology referred to the trial as its "pheNIX"
18 study.

19     50.     The pheNIX study consisted of two-parts. Part 1 was intended to
20 evaluate the safety and efficacy of HMI-102 in adults with PKU. Patients would
21 receive a single dose of HMI-102 administered intravenously. Up to three dose levels
22 of HMI-102 would be investigated with a minimum of two subjects per dose (or
23 cohort). Following evaluation of data from the first two subjects in a cohort,
24 Homology would either escalate to the next dose level or expand the cohort at the
25 selected dose level.

26     51.     Depending on the data from Part 1, Homology could proceed with Part
27 2 of the study which would test a selected dosage across an increased number of
28

subjects randomized to receive HMI-102 or a concurrent delayed treatment control arm. Part 2 of the study had the benefit of being converted into a registrational trial, meaning that Homology could use the data to support an NDA for commercialization.

52.     The primary endpoint for the pheNIX study was a meaningful reduction in phenylalanine levels without incidence of treatment emergent adverse events (specifically, two measurements below 360 μmol/L). Traditionally, adeno-associated virus vector-based gene therapies are associated with increased liver toxicity. Immunosuppression with corticosteroids (or steroids) consequently are integral to the gene therapeutic treatment process and are necessary to increase the success of the therapy without the patient rejecting it and/or having to discontinue treatment due to dangerous levels of toxicity.

53.     On June 10, 2019, Homology enrolled its first patient in the pheNIX study. This patient (Patient 1) was placed into the low-dose cohort (Cohort 1), per the pheNIX study protocol. Additional patients were added to the study over the next several months with the second patient (Patient 2) placed into the low-dose cohort (Cohort 1), the third patient (Patient 3) placed into the mid-dose cohort (Cohort 2), and the fourth patient (Patient 4) placed into the mid-dose cohort (Cohort 2).

54.     On December 17, 2019, Homology announced initial clinical data from the pheNIX trial. By this point in time, Homology had a total of four patients enrolled in its pheNIX study with two patients in Cohort 1 and two more in Cohort 2. Homology's announcement, however, described data from only the first three patients enrolled because data from the last patient (Patient 4) had been unavailable as of the data cutoff date of December 2, 2019.

55.     Homology described the initial clinical data, in pertinent part, as follows:

On December 17, 2019, Homology Medicines, Inc. (the "Company") announced initial clinical data from its first gene therapy clinical trial in phenylketonuria ("PKU"). The pheNIX trial is a Phase 1/2 randomized, concurrently controlled, dose-escalation study for adults with PKU. *As of December 2, 2019, two patients had received investigational HMI-*

*102 gene therapy in Cohort 1 (low-dose) and one patient in Cohort 2 (mid-dose). Preliminary safety data from Cohorts 1 and 2 showed HMI-102 was well-tolerated. Efficacy data from the first patient in Cohort 2 indicated a dose-response effect with an observed reduction in phenylalanine ("Phe") levels from baseline*, increase in tyrosine ("Tyr"), and reduction in the Phe/Tyr ratio, suggestive of increased enzymatic activity. Phe is a registrable endpoint in PKU, Tyr is a product of Phe metabolism and a precursor to neurotransmitters, and the Phe/Tyr ratio is a clinically relevant diagnostic measurement for PKU.

*The dataset encompasses two patients from Cohort 1 and one patient from Cohort 2. A second patient was dosed in Cohort 2 after the cutoff date, and therefore not included in this analysis.*

There were no treatment-emergent adverse events ("TEAEs") or serious TEAEs. All patients' alanine aminotransferase and aspartate aminotransferase levels remained within the normal range.

The first patient dosed in Cohort 2 experienced a reduction in Phe of 35% and 48% from baseline at Weeks 1 and 4, respectively, as compared to Cohort 1, which generally did not show a reduction in Phe through Weeks 10 and 12. This is consistent with a dose-response. Per the clinical trial protocol, patient baseline is defined as one day prior to dosing. The first patient dosed in Cohort 2 also showed increases in Tyr levels of 72% and 85% at Weeks 1 and 4, respectively, suggesting increased PAH enzyme activity. In addition, the patient experienced a 62% and 72% reduction in the Phe/Tyr ratio from baseline to Weeks 1 and 4, respectively.

(emphasis added)

56. Market analysts received the initial clinical data favorably. For example, analysts at BTIG commented in a research report dated December 17, 2019 that the "initial results are supportive of HMI-102's potential, and of Homology's AAVHSC technology more broadly" and "[m]ost importantly, the initial HMI-102 data includes no TEAEs [treatment emergent adverse events], no serious TEAEs, and ALT and AST levels [liver enzymes] within the normal range, supporting a safety profile

Amended Class Action Complaint          Case No. 2:22-cv-01968-FLA (JPRx)

1  sufficient for dose escalation to the highest dose, which we believe will be important

2  for HMI-102 to demonstrate significant Phe [phenylalanine] reduction."

3      57.    At the same time though, other analysts viewed the data less favorably.

4  For example, in a *Seeking Alpha* report dated January 3, 2020, one analyst emphasized

5  the lack of efficacy within the Cohort 1 data and questioned the significance of the

6  Cohort 2 data given that the patient (Patient 3) started the study with a relatively low

7  phenylalanine level to begin with, meaning that it would not have taken much for

8  HMI-102 to lower it further. The analyst also questioned why Homology had not

9  reported any information about the second patient in Cohort 2 (Patient 4) given that

10  he or she had been dosed at least one or two weeks prior to the presentation on

11  December 17, 2019, suggesting that it was negative or otherwise not supportive of

12  expanding the study to the high-dose cohort (Cohort 3).

13      **C.**    **Homology Expands pheNIX to Cohort 3.**

14      58.    Following its initial clinical data, Homology expanded the pheNIX study

15  with the implementation of the high-dose cohort (Cohort 3). The results of Cohort 3

16  were highly material to Homology and its investors given the equivocal data from

17  Cohorts 1 and 2 that already existed. Homology recruited two patients for Cohort 3

18  increasing the total number of patients in the pheNIX study to six. Although Cohort

19  3 results were not officially reported until November 6, 2020, negative data from the

20  study began to leak into the market beforehand.

21      59.    On March 10, 2020, Homology's first patient (Patient 5) for the high-

22  dose cohort (Cohort 3) in the pheNIX study presented at the Ann & Robert H. Lurie

23  Children's Hospital of Chicago in Chicago, Illinois, under the care of Dr. Barbara K.

24  Burton. Patient 5 underwent physical and cognitive tests at that time and was provided

25  a dose of prednisone (steroid).

26      60.    On March 11, 2020, Patient 5 received a high-dose of HMI-102.

27

28

Amended Class Action Complaint        Case No. 2:22-cv-01968-FLA (JPRx)

61.   On April 15, 2020, Patient 5 received her phenylalanine test results, which were significantly above the prespecified endpoint for the pheNIX study, *i.e.*, 1,497 μmol/L compared to the endpoint of <360 μmol/L. Further, Patient 5's liver enzymes were significantly elevated, requiring that she resume steroid treatment but with Decadron (dexamethasone) instead of prednisone. Decadron is a more potent and longer-acting steroid treatment than the prednisone initially prescribed to Patient 5.

62.   According to Patient 5, her elevated liver enzymes reflected severe and dangerous toxicity. Patient 5 stated, in pertinent part, as follows in an April 15, 2020 public post on Facebook:

> Last Thursday, I went to a local hospital and had blood drawn, the liver enzymes came back high and so they put me back up to 60mg of Prednisone. I went to Chicago for the appointment yesterday and got more blood work drawn. I told the case manager about all the side effects that have come back from upping the prednisone (fatigue, muscle pain, swelling, etc.)[.] I also mentioned that I missed my period this month (there is no way I am pregnant) and I can only assume that this is from the prednisone as well. They did a pregnancy test (was negative). ***I was told that my Phe [phenylalanine] levels have been keeping steady at around 25 (so still very high)*** and that my bilirubin levels have been staying consistent. ***On my way home I got a call that the liver enzymes were still elevated and they were keeping me on 60mg prednisone for now.*** (I assumed that was going to stay for another week)[.]
>
> I went home and once my husband was done with work he took the kids so I could take a nap. ***During my nap my phone died and I didn't plug it in/turn it on until 9pm. At that point I had missed many phone calls and e mails sent from the hospital.***
>
> ***My liver enzymes were even higher after being on the 60mg of prednisone for 4 days. So they put me on a much stronger steroid, Decadron, and wanted me to start Tuesday night. I got all these messages too late and the pharmacy was closed. They also said they wanted me to do another blood draw at the local hospital Thursday.***
>
> All this had me a little worried that things were getting out of control and I started to get a little nervous. The doctor called me this morning, however, and explained to me that this increase in liver enzymes is

17

completely expected and is kind of the wave before the crest! ***She said that the body will have this inflammatory response to the infusion (in all gene therapies, not just this one) they just didn't know how "bad" it was going to be because my dosage so much higher***. From what she explained, after they "ride out" the inflammation (using the stronger steroids) the flip side of it should be my body's acceptance and THAT is when the levels should start dropping off. (6-7 weeks post infusion) She also said that the fatigue and muscle/back pains are probably due to the inflammation/high liver enzymes rather than the prednisone itself.

(emphasis added)

63.    Patient 5's April 15, 2020 Facebook post represented a materially adverse development in the pheNIX trial data. Prior data from Cohorts 1 and 2 did not demonstrate marked evidence of efficacy, suggesting that the viability of HMI-102 would depend on the data from the high-dose cohort (Cohort 3). Patient 5 was the first and only high-dose patient in Cohort 3 as of April 15, 2020. Thus, if Patient 5's description of her phenylalanine levels "keeping steady" were accurate, then the pheNIX data would have failed to demonstrate a dose-response in the high-dose cohort (Cohort 3), *i.e.*, HMI-102 did not effectively lower Patient 5's phenylalanine levels.

64.    Separate and apart from HMI-102's efficacy, Patient 5's Facebook post also indicated that she sustained a severe, dangerous rise in her liver toxicity levels as a result of the high-dose of HMI-102. Homology needed to deviate materially from its prespecified steroid regimen to treat Patient 5's toxicity. Whereas Homology's protocol called for a course of prophylactic steroids, Patient 5 was given additional prednisone after the dose followed by a stronger steroid (Decadron) in hopes of curbing her elevated toxicity levels.

**D.    Defendants Cover Up Patient Five's Negative Data.**

65.    Patient 5's Facebook post was removed from Facebook and/or made private within a few hours after it was posted on April 15, 2020. Notwithstanding, the post immediately impacted Homology's stock price. The investors who had the

18

opportunity to read the post before it was removed sold their Homology shares in response to what they perceived as a material and negative development in the pheNIX study and HMI-102 in general. Indeed, on April 15, 2020, Homology's stock traded $18.65 per share at market open and closed at $13.97 per share, totaling an intraday decline of $4.68 per share on unusually heavy trading volume.

66.     Homology was aware of Patient 5's Facebook post and responded to it by selectively providing materially misleading information to sell-side analysts in an effort to shore up the company's falling stock price. For example, on April 16, 2020 at 6:01am ET, Matthew Biegler from Oppenheimer inquired about the Facebook post directly with McNeely via email who at that time was serving as Homology's Chief Communications Officer.

67.     On April 16, 2020, at 6:11am ET, McNeely responded to Mr. Biegler's inquiry as follows:

> Hey Matt,
>
> Some Facebook post. ***Nothing fundamental changed for FIXX but unfortunately, our stock price***. I hate social media. Will be speaking with folks today. Hopefully things will turn back around swiftly.
>
> Always helpful to hear what u and your traders are hearing. Thanks.
>
> Hope u and ur family are well,
>
> Theresa

(emphasis added)

68.     McNeely's response was false and/or materially misleading. This was because, contrary to what McNeely said in her email to Mr. Biegler, the "fundamental[s]" for Homology, the pheNIX study, and HMI-102 had in fact "changed" materially. Efficacy data from the pheNIX study prior to this point had been equivocal at best. The Cohort 1 data did not demonstrate an effective dose response and the data from Cohort 2 was questionable given that Patient 3's

19

phenylalanine levels were low to begin with and it appeared to some analysts that Homology had withheld Patient 4's results intentionally to conceal negative data. Thus, analysts and investors had significant interest in the data from the high-dose cohort (Cohort 3). Patient 5 was the first patient to receive a high-dose of HMI-102 in Cohort 3 and, contrary to expectations, the data showed that HMI-102 was both not effective and dangerous.

69. Upon information and belief, McNeely and/or other members of Homology management made similar false and/or materially misleading statements to additional sell-side analysts in an attempt to materially mislead the market about the high-dose cohort data from the pheNIX study. For example, on April 20, 2020, Madhu S. Kumar, Ph.D., an analyst from Baird issued a report titled, *Mid-20 PheNIX Data Risk/Reward Remains Bullish; Reit. Outperform, $32 PT*. In pertinent part, the report stated as follows:

> We are incrementally positive on pheNIX mid-20 data. **We recently addressed market concerns regarding a Facebook post from a potential patient in the Phase1/2 pheNIX trial** of Homology Medicines' (FIXX) adeno-associated virus gene therapy (AAV GT) HMI-102 for phenylketonuria (PKU). **Having spoken with FIXX management, we continue to favor the risk/reward dynamic for the mid-20 pheNIX update and thus reiterate our FIXX Outperform rating and $32 price target**.

(emphasis added)

70. Homology and its senior management continued to conceal and materially mislead investors about HMI-102 and the pheNIX study data in subsequent statements to the public. For example, in Homology's quarterly filing on Form 10-Q dated May 7, 2020, Tzianabos and Smith described Homology's progress within pheNIX trial by sharing information only from Cohort 1 and the first patient within Cohort 2, stating *inter alia* that "Preliminary safety data from three subjects in Cohorts 1 and 2 showed HMI-102 was well-tolerated with no treatment-emergent adverse

events" and that "[e]fficacy data from the first patient in Cohort 2 suggested a dose-response effect with an observed reduction in phenylalanine . . . ." No mention was made about Patient 4 from Cohort 2 or Patient 5 from Cohort 3, the data showing that HMI-102's mid- and high-dose was ineffective, or that the steroid regimen prescribed to HMI-102 patients needed to be modified based on Patient 5's response.

71.     Similarly, in Homology's quarterly filing on Form 10-Q dated August 10, 2020, Tzianabos and Smith repeated their statements from the previous quarterly report while declining to provide any other information about the patients from Cohort 2 or Cohort 3 and, instead, simply stating that, "Since reporting initial data from the pheNIX trial in December 2019, we enrolled and dosed patients in a third, high-dose cohort. We have continued to observe encouraging clinical data that suggest PAH enzymatic activity, and no treatment-related serious adverse events have been reported." These statements contradicted the truth about the Cohort 3 data and, in particular, the data from Patient 5.

**E.      Homology Continues to Conceal the Truth.**

72.     On November 6, 2020, at or before approximately 11:40am ET, Homology's principal investigator for the pheNIX trial, Dr. Olaf Bodamer, presented additional data from the pheNIX study during the annual meeting of the New England Consortium of Metabolic Programs ("NECMP"). In pertinent part, the presentation contained the data from the second patient (Patient 4) in the mid-dose cohort (Cohort 2) and the two patients (Patients 5 and 6) in the high-dose cohort (Cohort 3). It revealed that Patient 4 in Cohort 2 did not exhibit a dose response to HMI-102, *i.e.*, HMI-102 did not lower Patient 4's phenylalanine levels, which Homology had known shortly after dosing Patient 4 prior to December 17, 2019. It also revealed that HMI-102 was likewise not effective for Patient 5 in Cohort 3.

73.     While Dr. Bodamer disclosed the negative efficacy data that Homology had previously been concealing, the presentation continued to conceal the adverse

safety data from Patient 5 and, in particular, the extent of HMI-102's toxicity and the need to modify its accompanying steroid regimen. In pertinent part, Homology disclosed that Patients 4 and 5 exhibited Grade 3 alanine aminotransferase or ALTs, which were managed with "increased steroids," and that HMI-102's safety data supported advancing to the expansion phase of the pheNIX study, *i.e.*, Part 2 of the study.

74.     The market's reaction to Homology's presentation was tempered. Analyst reports were likewise mixed. For example, on November 6, 2020, RBC issued a report titled *Data Is Not Perfect, But We Do See Glass Half Full* stating, in pertinent part, that: "Admittedly the data is not perfect given 5/6 patients had ALT elevations (three grade 1 and two grade 3), only 2 of the 4 patients at the mid/high dose responded, diet could be confounding and Phe [phenylalanine] levels are intrinsically variable." RBC also echoed Homology's positive statements concerning the pheNIX data's support for advancement into the dose-expansion phase of the trial, writing that "Randomized Expansion Phase Is Well Designed And Will Start Early 2021- PheNIX will enter the randomized, potentially registrational part of the trial in early 2021 and we think the expansion phase is well designed given:1) both the mid-dose (6e13 vg/kg) and a dose in between the mid- and the high dose will be pursued (8e13 vg/kg), 2) patients with pre-existing immune conditions will be screened out and 3) key learnings around steroid prophylaxis/on-demand will be implemented in the protocol."

75.     Oppenheimer also reported mixed sentiments about the data. On November 8, 2020, in its report titled *Sell-Off Unjustified in Wake of Clinical PoC*, Oppenheimer wrote that: "While early, we think the data provide proof-of-concept support for advancement of PheNIX into dose expansion. FIXX shares sold off sharply Friday, as investors may have been spooked by treatment-induced liver toxicities that appeared to abrogate HMI-102'seffect in two of four patients treated at

potentially efficacious doses." Oppenheimer, too, relied on Homology's statements concerning its ability to advance to the dose-expansion phase, writing that: "Non-responders in the mid- and high-dose cohorts (Patients 4 and 5) had Grade3 elevations in liver enzymes following treatment, suggesting a potential immune response to the viral vector. Going forward, Homology plans to tighten the use of steroids to reduce the risk of immune response. Per management, these changes are in line with other AAV-based therapies currently in development."

76.     Some analysts were less taken with Homology's reports. Chardan, for example, issued a report on November 10, 2020 titled *PKU data not yet clear cut but PFE investment extends runway*. The report noted, in pertinent part, that:

> . . . uncertainty arises from the 50% response rate, but also because Patient 6 (from Cohort 3) has thus far only reached the target ≤360 μmol/L Phe [phenylalanine] on 1 instance over 13 weeks of follow-up. Patient 3 from Cohort 2 has had 5 instances below the target over 48 weeks. However, we note Patient 3 appeared to have a fairly low pre-treatment mean Phe level (mean 779, per Homology's initial 2019 data release, though the official baseline the day before treatment was higher). . . . Overall, while the results thus far indicate HMI-102 has biological activity and is capable of reducing Phe levels, given the multiple complicating factors, ***the data thus far do not yet definitively demonstrate modification of the steroid regimen could address the major sources of variability in post-treatment Phe levels***.

(emphasis added)

77.     In sum, the positive statements about HMI-102's advancement to the expansion phase of the study offset the news about the negative efficacy and safety data. As a result, Homology's stock price declined less than it would have had the truth about HMI-102's safety been disclosed. Between November 5 and 6, 2020, Homology's stock fell from $12 per share to $9.50 per share on unusually heavy volume.

1    **F.    Homology Raises Money on False Prospects.**

2    78.    Contemporaneously with its announcement of the data on November 6,

3    2020, Homology proclaimed it would be advancing to the dose-expansion phase of

4    the trial. The dose-expansion phase would include two doses (a mid-dose and a high-

5    dose) combined with a modified steroid regimen. Whereas the dose-escalation phase

6    of the trial incorporated a course of prophylactic steroids, Homology changed the

7    steroid regimen in light of the adverse dose-expansion findings to include rescue

8    steroids, *i.e.*, longer post-infusion immunosuppression treatment. Homology's

9    announcement was significant given the fact that the dose-expansion phase of the

10   pheNIX trial could be converted into a registrational trial capable of supporting a

11   regulatory application with the FDA (*e.g.*, an NDA).

12   79.    On November 9, 2020, just days after its announcement of the pheNIX

13   data, Homology announced a $60 million equity investment from Pfizer Inc. In

14   pertinent part, Homology stated that:

15   Homology Medicines, Inc. (Nasdaq: FIXX), a genetic medicines
16   company, announced today that Pfizer Inc. (NYSE: PFE) has agreed to
     make a $60 million equity investment in Homology. Pfizer has agreed to
17   purchase 5,000,000 of Homology's common stock at a price of $12.00
18   per share, as part of the Pfizer Breakthrough Growth Initiative, which
     was announced earlier this year. The purchase by Pfizer is expected to
19   close on or about November 10, 2020.

20   "*With the positive clinical data from the dose-escalation phase of our*
21   *pheNIX Phase 1/2 trial for adults with phenylketonuria (PKU) and our*
     *plans to move to the expansion phase of the trial, both of which we*
22   *announced last week, we believe Pfizer's investment in Homology is a*
23   *testament to their enthusiasm for our PKU gene therapy and gene*
     *editing programs to treat people living with this disease*," stated Arthur
24   Tzianabos, Ph.D., President and Chief Executive Officer of Homology
25   Medicines.

26   . . .

27

28

24

> ***Homology intends to use the net proceeds of the offering to help fund its ongoing and planned PKU clinical trials***, as well as the Company's central nervous system (CNS) programs. Based on current projections, together with the anticipated proceeds of $60 million from the Pfizer equity investment, Homology expects cash resources to fund operations into the third quarter of 2022.

(emphasis added)

80.     Homology proceeded with registration for the dose-expansion phase of the pheNIX trial through 2021 while representing to investors that it would provide data from the trial by year-end 2021. During this time, Defendants continued to make false and/or materially misleading statements about the safety and efficacy of HMI-102 and the viability of the dose-expansion phase of the pheNIX trial. Defendants also continued to raise money on the false prospects of HMI-102's efficacy and safety. This included Homology's follow-on offering on April 7, 2021, which resulted in approximately $49.7 million from selling over 6.5 million shares to the public.

81.     On October 12, 2021, Homology announced it would need to delay its initial presentation of data from the dose-expansion phase of the trial from late-2021 to mid-2022. At the same time, it also announced that its investigational new drug application, or IND, was approved for the "pheEDIT" clinical trial for HMI-103. An IND application is necessary to obtain approval from the FDA to commence a clinical trial. IND applications are, at the earliest, approved 30 days after submission. Homology's pheEDIT trial protocol incorporated a steroid regimen that included a T-cell inhibitor used in combination with other steroids.

82.     Homology continued to refer to the pheNIX data positively throughout the remainder of 2021. For example, in press releases and quarterly filings on October 12 and November 15, 2021, Defendants discussed the dose-expansion data from the pheNIX trial, stating that HMI-102 has been "generally well-tolerated and have shown evidence of biological activity, including clinically meaningful reductions in Phe [phenylalanine] levels."

83.   Analysts and investors relied on these representations and material updates concerning Homology's progress towards advancing HMI-102 towards a registrational trial. For example, on October 13, 2021, Oppenheimer published a report titled *IND Clearance an Important Milestone, but a Rising pheNIX Must Wait; PT to $22*, noting that Homology's delay in announcing pheNIX data from the dose-expansion phase could prove beneficial given that "Per management, both doses being tested in dose expansion have been well tolerated, with initial signs of biological activity."

84.   Similarly, Chardan focused on these claims in its report dated November 15, 2021, titled *pheNIX P2 Data Update Mid-2022; 3Q21 Results, PT to $25*. In pertinent part, Chardan wrote: "Both doses (6e13 vg/kg and 8e13 vg/kg) in the expansion phase of the trial have been generally well-tolerated, and have shown reductions in Phe [phenylalanine] levels, increases in Tyr and reductions in the Phe-to-Tyr ratio."

85.   On January 28, 2022, with the pheNIX data still outstanding, Homology announced a massive funding deal with Oxford Biomedica plc that resulted in Homology receiving $130 million in exchange for its participation in a joint manufacturing agreement. In pertinent part, Homology's press release announcing the deal stated as follows:

> OXFORD, United Kingdom and BEDFORD, Mass., Jan. 28, 2022 (GLOBE NEWSWIRE) -- Oxford Biomedica plc (LSE:OXB) ("Oxford Biomedica" or "the Group"), a leading gene and cell therapy group, and Homology Medicines, Inc. (Nasdaq: FIXX) ("Homology"), a genetic medicines company, announced today that the companies have agreed to establish a high-performing, full scope Adeno-Associated Virus (AAV) Manufacturing and Innovation Business in the U.S.
>
> . . .
>
> Under the terms of the agreement, ***the Group will pay Homology $130 million upfront and invest $50 million to fund Oxford Biomedica Solutions in return for an 80 percent ownership stake, while Homology***

*will own 20 percent of the new company*. Additionally, at any time following the three-year anniversary of the agreement, the Group will have a call option to purchase, and Homology will have a put option to require the Group to purchase, Homology's ownership interest in Oxford Biomedica Solutions.

(emphasis added)

86.     Homology's deal with Oxford Biomedica extended Homology's cash runway by two years. According to analyst estimates, Homology's cash as of 3Q21 provided it with an "operational runway into 1Q23," which Homology successfully extended to the second half of 2024 with the Oxford Biomedica deal. Oppenheimer, for example, wrote in its report dated January 31, 2022 titled *Oxford Partnership Extends Runway by Two Years*, that:

Friday, Homology announced that Oxford Biomedica had taken a majority stake in its AAV production capabilities via the formation of a new company. We see the deal as a savvy move by Homology because it monetizes the company's extensive investment sin manufacturing—which we always viewed as an underappreciated component of the story. Homology never intended to be a CMO, and *we think the deal should allow management to exclusively focus its sights on the pipeline—including the potentially registrational PheNIX trial of HMI-102. It also extends the company's runway by two years (into 2H24), which is especially noteworthy given the current state of capital markets*. Updates from the dose expansion portion of PheNIX remain on tap for mid-year.

(emphasis added)

87.     While unbeknownst to investors at the time, within a month of Homology's announcement the FDA would shut down the pheNIX trial due to safety concerns relating to HMI-102 and its concomitant steroid regimen.

### G.     FDA Clinical Hold.

88.     On February 18, 2022, after market close, Homology issued a press release titled, *Homology Medicines Provides an Update on pheNIX Gene Therapy Trial for Adults with PKU*. The press release revealed that the FDA had placed the

pheNIX study on "clinical hold," meaning that Homology had to immediately cease the clinical trial pending further permission from the FDA. In pertinent part, the press release stated as follows:

> Homology Medicines, Inc. (Nasdaq: FIXX), a genetic medicines company, announced today that ***the U.S. Food and Drug Administration (FDA) has notified the company that its pheNIX gene therapy trial of HMI-102 in adults with phenylketonuria (PKU) has been placed on clinical hold due to the need to modify risk mitigation measures in the study in response to observations of elevated liver function tests***. The Company expects to receive an official clinical hold letter within 30 days. Homology plans to provide an update pending further clarity from the FDA.

> "We look forward to working with the FDA to address the Agency's questions and feedback once we receive the letter," stated Arthur Tzianabos, Ph.D., President and Chief Executive Officer of Homology Medicines. "***This hold on our PKU gene therapy trial is based on clinical observations in the pheNIX study*** and does not relate to CMC/manufacturing capabilities or Homology's other clinical programs. We plan to provide next steps once we have more information following our FDA interactions."

(emphasis added)

89.    During the clinical study process, the FDA can issue a "clinical hold" under certain circumstances. A clinical hold is an order issued by FDA to the sponsor to delay a proposed clinical investigation or to suspend an ongoing investigation.

90.    The FDA may issue a clinical hold in several circumstances, including when human subjects are or would be exposed to an unreasonable and significant risk of illness or injury. For example, the FDA will issue a clinical hold where previously observed toxicities of the product are not addressed by the proposed safety assessments in a clinical protocol.

91.    Whenever the FDA concludes that a deficiency exists in a clinical investigation that may be grounds for the imposition of clinical hold, the FDA will, unless patients are exposed to immediate and serious risk, attempt to discuss and

satisfactorily resolve the matter before issuing the clinical hold order. When a proposed study is placed on clinical hold, subjects may not be given the investigational drug. When an ongoing study is placed on clinical hold, no new subjects may be recruited to the study and given the investigational drug; patients already in the study are expected to be taken off therapy involving the investigational drug unless treatment continuation is specifically permitted by FDA in the interest of patient safety.

92. The issuance of the clinical hold signaled to investors and the market at large that HMI-102 was significantly more dangerous than Homology had previously disclosed and that its prescribed steroid regimen was inadequate and needed to be modified. RBC, for example, downgraded Homology heavily on February 22, 2022. In its report titled *Downgrading to SP Post PKU Clinical Hold*, RBC wrote that:

> our conviction in upcoming data (company reaffirmed mid-22) is now muted given patients experiencing the liver test elevations are likely non responders and threading the needle between efficacy (mixed so far) and safety (liver tox) appears to be increasingly difficult. **We downgrade to Sector Perform, Speculative Risk, and lower our PT from $30 to $4**.

(emphasis added)

93. In response to the news, Homology's stock price fell an astounding 32.64%, or $1.26 per share, from $3.86 per share on February 18, 2022 to $2.60 per share on February 22, 2022 (the next trading day) on unusually heavy volume.

**H.     Post-Class Period Events.**

94. On March 23, 2022, Homology issued a press release announcing its fourth quarter and full year financial results for 2021. Within the press release, Homology addressed the FDA's clinical hold that it had announced the previous month. In pertinent part, Homology's press release stated as follows:

> Consistent with Homology's prior announcement of a clinical hold on its pheNIX gene therapy trial for phenylketonuria (PKU), the Company received the anticipated letter from the U.S. Food and Drug

29

Administration (FDA) detailing the information requested for elevated liver function tests (LFTs) observed in the trial and modified clinical-mitigation measures with nothing related to Homology's other two clinical programs or its CMC/manufacturing capability. In patients who experienced elevated LFTs, all have resolved and no hospitalizations were required. ***Among the risk-mitigation methods that Homology intends to propose is a new, more targeted immunosuppressive regimen that is shorter in duration and includes a T-cell inhibitor used in combination with a steroid-sparing regimen that may improve patient compliance. The Company has already incorporated this regimen into its pheEDIT gene editing trial for adults with PKU***. The use of T-cell inhibitors has been shown to be effective in dampening the anticipated immune response to AAV capsids, which are commonly employed to deliver genetic medicines. Homology also noted that interest in the pheEDIT study is steadily increasing with 15 clinical sites already selected to participate, several pending site initiation visits expected shortly, and more clinical trial sites on the horizon. A program update on pheEDIT is still expected by year-end 2022.

With the additional information requested by FDA on the pheNIX trial and the planned conversion to a more specific steroid-sparing immunosuppressive regimen, ***Homology estimates that it will require more time to submit and receive feedback on its proposed clinical risk-mitigation strategy. This also includes time needed to amend the pheNIX study protocol***. As a result, the Company now expects to provide a program update when the path forward is established with FDA.

(emphasis added)

95.     Homology's modification to its steroid regimen necessitated additional approval from the FDA and an update to the pheNIX study trial protocol. In turn, Homology's efforts to transition the pheNIX study into a registrational trial and commercialize HMI-102 were delayed.

96.     Homology modified its steroid regimen with the addition of T-cell inhibitors to dampen the immune response after dosing with HMI-102. Homology had already incorporated this risk mitigation strategy into another clinical trial, its Phase 1 pheEDIT trial, in the fourth quarter of 2021. The immunosuppressive strategy

30

had also been used in gene therapy studies conducted by Rocket Pharmaceuticals and Freeline Therapeutics.

## V.     FALSE AND/OR MATERIALLY MISLEADING STATEMENTS

<u>March 12, 2020 – Press Release</u>

97.     On March 12, 2020, after market close, Homology published a press release titled *Homology Medicines Reports Fourth Quarter and Full Year 2019 Financial Results and Recent Accomplishments*.

98.     Homology's press release provided investors with false and/or materially misleading information about the pheNIX study data, specifically its results from Cohort 2 of the study. In pertinent part, the press release stated as follows when listing Homology's "Fourth Quarter 2019 and Recent Accomplishments":

> Shared initial encouraging clinical data from a single I.V. administration of investigational gene therapy HMI-102 in the pheNIX trial, the first gene therapy clinical trial in phenylketonuria (PKU). Keeping with guidance initially set in 2018, Homology released initial data from Cohort 1 (low-dose, n=2) and the first patient in Cohort 2 (mid-dose) at the end of 2019. As of the data cut-off date of December 2, 2019:
>
> - ***Preliminary safety data from Cohorts 1 and 2 showed HMI-102 was well-tolerated***.
>
> - ***Efficacy data from the first patient in Cohort 2 indicated a dose-response effect with an observed reduction in phenylalanine (Phe) levels from baseline at Weeks 1 and 4, increase in tyrosine (Tyr), and reduction in the Phe to Tyr ratio, suggestive of increased enzymatic activity***.
>
> - The dose-escalation part of the trial is ongoing and Homology expects to provide an update mid-year 2020 once a dose is selected for the randomized, concurrently controlled Part B expansion phase of the trial, which has the potential to be converted to a registrational trial.

(emphasis added)

99.     The above statements identified in emphasis were false and/or materially misleading. As of March 12, 2020, Homology was in possession of Patient 4's data

31

from Cohort 2, which failed to show an effective dose-response. Homology dosed Patient 4 after the data cut-off deadline of December 2, 2019 but before it announced data on December 17, 2019. Thus, Homology had collected between 12 and 14 phenylalanine measurements from Patient 4 by March 12, 2020. Each of these measurements (except for the very first one, *i.e.*, Week 1) showed elevated or unchanged levels of phenylalanine; specifically, Weeks 4 and 8 showed unchanged or "baseline" phenylalanine measurements while the remainder all demonstrated elevated levels of phenylalanine. By discussing only the favorable data from Cohort 2 while omitting the negative data, Homology misled investors as to HMI-102's efficacy and the Cohort 2 data from the pheNIX study.

100.   The following chart contains Patient 4's phenylalanine measurements from Week 1 through Week 14:



Amended Class Action Complaint                    Case No. 2:22-cv-01968-FLA (JPRx)

101.   The above chart shows that the Patient 4's first measurement was an outlier, given that each measurement thereafter failed to demonstrate a reduction in phenylalanine levels. Defendants did not disclose this, even though they were in possession of the data. Instead, they provided investors with only the positive data from the first patient in Cohort 2 (Patient 3). As a result, investors were left with a false and materially misleading impression of the pheNIX study data that existed as of March 12, 2020.

102.   The false and materially misleading impression created by Defendants led investors to believe that HMI-102 was more effective and safer than it truly was given that Patient 4 did not exhibit a dose-response and instead suffered from a "Grade 3 ALT elevation" which indicated increased liver toxicity as a result of the drug.

<u>March 12, 2020 – Annual Report</u>

103.   On March 12, 2020, after market hours, Homology published its annual report on Form 10-K for fiscal 2019. Tzianabos and Smith signed the annual report on behalf of Homology.

104.   Homology's annual report provided investors with false and/or materially misleading information about the pheNIX study. In pertinent part, the annual report stated as follows:

> We are currently in the dose-escalation portion of our Phase 1/2 pheNIX clinical trial with our first and lead product candidate, HMI-102, a gene therapy for the treatment of phenylketonuria, or PKU. Once a dose is chosen, we will initiate the randomized, concurrently controlled Part B of the trial, which has the potential to be converted to a registrational trial. In December 2019, in accordance with a corporate goal that we had established in early 2018, we reported encouraging initial clinical data from the pheNIX trial from Cohort 1 (low dose, n=2) and Cohort 2 (mid-dose, n=1) based on the data cutoff date of December 2, 2019. Preliminary safety data from Cohorts 1 and 2 showed HMI-102 was well-tolerated with no treatment-emergent adverse events, or TEAEs, or serious TEAEs. ***Efficacy data from the first patient in Cohort 2 suggested a dose-response effect with an observed reduction in phenylalanine, or Phe, levels from baseline and a corresponding***

*increase in tyrosine, or Tyr, which translated to an overall reduction in the phenylalanine to tyrosine ratio, or Phe/Tyr ratio, suggestive of increased enzymatic activity.* Phe levels have been evaluated as a primary registrable endpoint in previous PKU clinical trials, Tyr is a product of Phe metabolism and a precursor to neurotransmitters, and the Phe/Tyr ratio is a clinically relevant diagnostic measurement for PKU.

. . .

*Preliminary safety data from the first three subjects in Cohorts 1 and 2 showed HMI-102 was well-tolerated. There were no TEAEs or serious TEAEs. All patients' alanine aminotransferase, or ALT, and aspartate aminotransferase, or AST, levels remained within the normal range*.

*"Efficacy data from the first patient in Cohort 2 suggested a dose-response effect with an observed reduction in Phe levels from baseline and a corresponding increase in Tyr, which translated to an overall reduction from baseline in the Phe/Tyr ratio, suggestive of increased enzymatic activity.* Phe levels have been evaluated as a primary registrable endpoint in previous PKU clinical trials, Tyr is a product of Phe metabolism and a precursor to neurotransmitters, and the Phe/Tyr ratio is a clinically relevant diagnostic measurement for PKU.

*Specifically, the first patient dosed in Cohort 2 experienced a reduction in Phe of 35% and 48% from baseline at Weeks 1 and Week 4, respectively, as compared to patients in Cohort 1, which generally did not show reductions in Phe through Weeks 10 and 12 (refer to Figure 8 below). This is consistent with a dose-response.* The first patient dosed in Cohort 2 also showed increases in Tyr levels of 72% and 85% at Weeks 1 and Week 4, respectively, suggesting increased PAH enzyme activity (refer to Figure 9 below). In addition, the patient experienced a 62% and 72% reduction in the Phe/Tyr ratio from baseline to Weeks 1 and 4, respectively (refer to Figure 10 below). Patient baseline is defined in the study protocol as one day prior to dosing. All patients reported maintaining consistent protein intake pre- and post-treatment.

(emphasis added)

105.  The above statements identified in emphasis were false and/or materially misleading. As of March 12, 2020, Homology was in possession of Patient 4's data from Cohort 2, which failed to show an effective dose-response. Indeed, as of March

12, 2020, Homology had collected between 12 and 14 phenylalanine measurements from Patient 4, each of which showed elevated or unchanged levels of phenylalanine (except for the very first one, *i.e.*, Week 1). By discussing only the favorable data from Cohort 2 while omitting the negative data, Homology misled investors as to HMI-102's efficacy and safety and, in particular, the Cohort 2 data from the pheNIX study.

April 16, 2020 – McNeely Email

106.   On April 16, 2020, at 6:01am ET, Oppenheimer research analyst Michael Biegler emailed McNeely to inquire about Patient 5's Facebook post. McNeely responded to Mr. Biegler's inquiry on April 16, 2020, at 6:11am ET as follows:

> Hey Matt,
>
> Some Facebook post. ***Nothing fundamental changed for FIXX but unfortunately, our stock price***. I hate social media. Will be speaking with folks today. Hopefully things will turn back around swiftly.
>
> Always helpful to hear what u and your traders are hearing. Thanks.
>
> Hope u and ur family are well,
>
> Theresa

(emphasis added)

107.   The statement identified above in emphasis was false and/or materially misleading. Contrary to what McNeely said in her email to Mr. Biegler, the "fundamental[s]" for Homology, the pheNIX study, and HMI-102 had in fact "changed" materially. The overwhelming majority of the efficacy data from the pheNIX study prior to this point had been negative. The Cohort 1 data did not demonstrate an effective dose response and the data from Cohort 2 was questionable given that Patient 3's phenylalanine levels were low to begin with and it appeared to some analysts that Homology had withheld Patient 4's results intentionally to conceal negative data. Thus, analysts and investors had significant interest in the data from

35

the high-dose cohort (Cohort 3). Patient 5 was the first patient to receive a high-dose of HMI-102 in Cohort 3 and, contrary to Defendants' statements, the data showed that HMI-102 was both not effective and dangerous.

108. Specifically, the high-dose of HMI-102 did not lower Patient 5's phenylalanine levels and, therefore, did not demonstrate an efficacious response. As stated in her Facebook post, Patient 5's phenylalanine levels had "been keeping steady," *i.e.*, 1,497 μmol/L compared to the prespecified primary endpoint of <360 μmol/L. Further, as described by Patient 5 in her Facebook post, her liver enzymes "came back high" and was experiencing severe liver toxicity. Patient 5 proceeded to receive increased steroids, including Decadron which is a stronger steroid than what Patient 5 was initially prescribed. Thus, contrary to McNeely's statement to the Oppenheimer analyst, the pheNIX data from Patient 5 within Cohort 3 had amounted to a "fundamental change[]" insofar as the study results were now substantially less supportive of HMI-102's clinical benefit as compared to the data before Patient 5's results were received.

<u>April 20, 2020 – Baird Analyst Report</u>

109. On April 20, 2020, Baird published a research report written by Senior Research Analyst Madhu S. Kumar, Ph.D, titled *Mid-20 PheNIX Data Risk/Reward Remains Bullish; Reit. Outperform, $32 PT*.

110. In pertinent part, the Baird research report stated as follows:

> We are incrementally positive on pheNIX mid-20 data. We recently addressed market concerns regarding a Facebook post from a potential patient in the Phase1/2 pheNIX trial of Homology Medicines' (FIXX) adeno-associated virus gene therapy (AAV GT) HMI-102 for phenylketonuria (PKU). Having spoken with FIXX management, ***we continue to favor the risk/reward dynamic for the mid-20 pheNIX update*** and thus reiterate our FIXX Outperform rating and $32 price target.

(emphasis added)

Amended Class Action Complaint                    Case No. 2:22-cv-01968-FLA (JPRx)

111. The statement identified above in emphasis is attributable to Defendants. The report states that Baird had "recently addressed market concerns regarding a Facebook post from a potential patient" in the pheNIX study, referring to Patient 5's Facebook post on April 15, 2020. The report then states Baird had "spoken with [Homology] management" about the Facebook post and that, based upon management's representations, Baird was "continu[ing] to favor [HMI-102's] risk/reward dynamic." Consequently, the statement concerning HMI-102's "risk/reward dynamic" clearly originated from Homology's "management" and were merely reported by Baird. Defendants are liable for the statement identified above that appeared in Baird's research report.

112. The statement identified above in emphasis concerning HMI-102's "risk/reward dynamic" was false and/or materially misleading. The "risk/reward dynamic" referred to whether the pheNIX trial data had thus far demonstrated HMI-102's ability to provide a clinical benefit to patients, meaning that its efficacy outweighed its risks. Defendants represented to Baird who, in turn, represented to the public that the trial data collected to date supported HMI-102's clinical benefit. This was in spite of, and contrary to, the data from Patients 4 and 5 that failed to show a dose-response, *i.e.*, HMI-102 did not lower phenylalanine levels. Further, Patients 4 and 5 suffered adverse safety reactions to HMI-102, with Patient 5's reaction necessitating a modification to the prespecified steroid regimen used in the pheNIX study. Thus, the pheNIX trial data and, in particular, the data from Patients 4 and 5 within Cohorts 2 and 3 did not "favor" the "risk/reward dynamic" at the time of the above statement.

37

1

<u>May 7, 2020 – Quarterly Report</u>

2      113.   On May 7, 2020, after market close, Homology published its quarterly

3   report on Form 10-Q for fiscal 1Q20. Tzianabos and Smith signed the quarterly report

4   on behalf of Homology.

5      114.   Homology's quarterly report provided investors with false and/or

6   materially misleading information about the pheNIX study data. In pertinent part, the

7   quarterly report stated as follows:

8
> We are currently in the dose-escalation portion of our Phase 1/2 pheNIX
9
> clinical trial with our first and lead product candidate, HMI-102, a gene
> therapy for the treatment of phenylketonuria, or PKU. Once a dose is
10
> chosen, we plan to initiate the randomized, concurrently controlled Part
11
> B of the trial, which has the potential to be converted to a registrational
> trial. In December 2019, in accordance with a corporate goal that we had
12
> established in early 2018, we reported encouraging initial clinical data
13
> from the pheNIX trial from Cohort 1 (low dose, n=2) and Cohort 2 (mid-
> dose, n=1) based on the data cutoff date of December 2, 2019.
14
> ***Preliminary safety data from three subjects in Cohorts 1 and 2 showed***
15
> ***HMI-102 was well-tolerated with no treatment-emergent adverse***
> ***events, or TEAEs, or serious TEAEs. Efficacy data from the first***
16
> ***patient in Cohort 2 suggested a dose-response effect with an observed***
17
> ***reduction in phenylalanine***, or Phe, levels from baseline and a
> corresponding increase in tyrosine, or Tyr, which translated to an overall
18
> reduction in the phenylalanine to tyrosine ratio, or Phe/Tyr ratio,
19
> suggestive of increased enzymatic activity. Phe levels have been
> evaluated as a primary registrable endpoint in previous PKU clinical
20
> trials, Tyr is a product of Phe metabolism and a precursor to
21
> neurotransmitters, and the Phe/Tyr ratio is a clinically relevant
> diagnostic measurement for PKU.
22

23   (emphasis added)

24      115.   The above statements identified in emphasis were false and/or materially

25   misleading. As of May 7, 2020, Homology had already received Patient 4's data from

26   Cohort 2, which failed to show an effective dose-response, and Patient 5's data from

27   Cohort 3, which showed that HMI-102 was not effective at its prespecified high-dose

28   and that it was more toxic and dangerous than anticipated. Contrary to these facts,

38

Defendants referred to the pheNIX data positively and without exception, thereby creating the false impression that the materially negative data from Patients 4 and 5 did not exist and/or did not contradict the pheNIX study data from Cohorts 1 and 2.

116. Specifically, Patient 4's data from Cohort 2 had been previously withheld from public reports due to the fact that it did not meet the data cutoff deadline of December 2, 2019. By May 7, 2020, however, Patient 4's data was available and, as later revealed, did not show an effective dose-response, *i.e.*, HMI-102 did not lower Patient 4's phenylalanine levels below the prespecified levels within pheNIX's study protocol. Likewise, without any mention of the Cohort 3 data from Patient 5, Defendants represented that the data from Cohorts 1 and 2 showed that HMI-102 was "well-tolerated" with no adverse events and that the data from Cohort 2 showed a "dose-response effect, meaning that HMI-102 was effective. Thus, by concealing the data from Patients 4 and 5, Defendants created a materially misleading impression that the HMI-102 was safe and effective when, in reality, the data showed that it was not.

<u>August 10, 2020 – Press Release</u>

117. On August 10, 2020, after market close, Homology published a press release titled *Homology Medicines Reports Second Quarter 2020 Financial Results and Provides Business Update*.

118. Homology's press release provided investors with false and/or materially misleading information about the pheNIX study data when discussing its "Second Quarter 2020 and Recent Accomplishments." In pertinent part, the press release stated as follows:

Second Quarter 2020 and Recent Accomplishments

Announced today an update to the Phase 1/2 pheNIX gene therapy clinical trial with HMI-102 for adults with phenylketonuria (PKU):

***Since the Company's initial trial data reported in December 2019:***

Amended Class Action Complaint          Case No. 2:22-cv-01968-FLA (JPRx)

> *Homology continued to observe encouraging clinical data that suggest PAH enzymatic activity.*
>
> *High-dose Cohort 3 patients were enrolled and dosed.*
>
> *No treatment-related serious adverse events were reported.*
>
> Homology is extending the timeline for the dose-escalation portion of the trial before selecting a dose for the expansion phase of the trial, and plans to provide an update when the dose is chosen.
>
> As previously stated, Homology has all the expected supply on-hand for the dose-escalation and expansion phases of the pheNIX trial and continues to produce supply for the pivotal trial in its internal manufacturing facility.

(emphasis added)

119.   The above statements identified in emphasis were false and/or materially misleading. As of August 10, 2020, Homology was in possession of Patient 4's data from Cohort 2, which failed to show an effective dose-response, and Patient 5's data from Cohort 3, which showed that HMI-102 was not effective at its prespecified high-dose and that it was more toxic and dangerous than anticipated. Contrary to these facts, Defendants referred to the pheNIX data positively and without exception, claiming that data obtained "since . . . December 2019" was "encouraging clinical data" that did not show any evidence of "treatment-related serious adverse events," including from the "[h]igh-dose Cohort 3 patients." Consequently, Homology's press release created the false impression that the materially negative data from Patients 4 and 5 did not exist and/or did not contradict the pheNIX study data from Cohorts 1 and 2 reported on December 17, 2019.

### August 10, 2020 – Quarterly Report

120.   On August 10, 2020, after market close, Homology published its quarterly report on Form 10-Q for fiscal 2Q20. Tzianabos and Smith signed the quarterly report on behalf of Homology.

121.   Homology's quarterly report provided investors with false and/or materially misleading information about the pheNIX study data. In pertinent part, the quarterly report stated as follows:

> We are currently in the dose-escalation portion of our Phase 1/2 pheNIX clinical trial with our first and lead product candidate, HMI-102, a gene therapy for the treatment of phenylketonuria, or PKU. Once a dose is chosen, we plan to initiate the randomized, concurrently controlled Part B of the trial, which has the potential to be converted to a registrational trial. In December 2019, in accordance with a corporate goal that we had established in early 2018, we reported encouraging initial clinical data from the pheNIX trial from Cohort 1 (low dose, n=2) and Cohort 2 (mid-dose, n=1) based on the data cutoff date of December 2, 2019. ***Preliminary safety data from three subjects in Cohorts 1 and 2 showed HMI-102 was well-tolerated with no treatment-emergent adverse events, or TEAEs, or serious TEAEs, that were related to HMI-102. Efficacy data from the first patient in Cohort 2 suggested a dose-response effect with an observed reduction in phenylalanine***, or Phe, levels from baseline and a corresponding increase in tyrosine, or Tyr, which translated to an overall reduction in the phenylalanine to tyrosine ratio, or Phe/Tyr ratio, suggestive of increased enzymatic activity. Phe levels have been evaluated as a primary registrable endpoint in previous PKU clinical trials, Tyr is a product of Phe metabolism and a precursor to neurotransmitters, and the Phe/Tyr ratio is a clinically relevant diagnostic measurement for PKU.
>
> Since reporting initial data from the pheNIX trial in December 2019, we enrolled and dosed patients in a third, high-dose cohort. ***We have continued to observe encouraging clinical data that suggest PAH enzymatic activity, and no treatment-related serious adverse events have been reported***. Due to delays in enrolling and dosing patients in our pheNIX trial caused by the COVID-19 pandemic, we are extending the timeline for the dose-escalation portion of the trial before selecting a dose for the expansion phase of the trial.

(emphasis added)

122.   The above statements identified in emphasis were false and/or materially misleading. As of August 10, 2020, Homology was in possession of Patient 4's data from Cohort 2, which failed to show an effective dose-response, and Patient 5's data

from Cohort 3, which showed that HMI-102 was not effective at its prespecified high-dose and that it was more toxic and dangerous than anticipated. Contrary to these facts, Defendants referred to the pheNIX data collectively and then, in particular, the Cohort 3 pheNIX data positively and without exception, claiming that data obtained "[s]ince . . . December 2019" was "encouraging clinical data" that did not show any evidence of "treatment-related serious adverse events," including from the "[h]igh-dose Cohort 3 patients." Consequently, Homology's press release created the false impression that the materially negative data from Patients 4 and 5 did not exist and/or did not contradict the pheNIX study data from Cohorts 1 and 2 reported on December 17, 2019.

<u>November 6, 2020 – Press Release</u>

123.   On November 6, 2020, at 11:40am ET, Homology issued a press release titled *Homology Medicines Announces Presentation of Positive Data from the Dose-Escalation Phase of the pheNIX Gene Therapy Trial for Adults with PKU*.

124.   Homology's press release provided investors with false and/or materially misleading information about the pheNIX study and Homology's ability to convert it into a registrational trial. In pertinent part, the press release stated as follows:

Safety Observations

HMI-102 was generally well-tolerated, and there were no treatment-related serious adverse events (SAEs). There were no clinically significant changes in ECG or vital signs and no clinical signs of complement activation. ***The Grade 1 and 3\* alanine aminotransferases (ALTs) observed in Cohorts 2 and 3, which is common in AAV-based gene therapy, were managed with increased steroids when necessary***. The patients who experienced Grade 3 ALTs had pre-existing underlying immune conditions. An independent data monitoring committee, which provided guidance throughout the pheNIX trial, concluded that there were no safety concerns related to bilirubin, and that ALT elevations may be associated with reduced efficacy.

> *Updates to the expansion phase of the pheNIX trial, including key learnings related to patient selection, monitoring and steroid regimen, are being incorporated*.

Efficacy Observations

. . .

In Cohorts 2 and 3, Phe reductions were greater among patients with Grade 1 ALTs compared to patients with Grade 3 ALTs****; *ALT elevations were managed with increased steroids when necessary. It appears higher ALT elevations may limit therapeutic activity, but can be managed with a modified steroid regimen, which is being incorporated into the expansion phase*.

Expansion Phase

Based on the safety and efficacy results observed in the dose-escalation phase, Homology is advancing to the randomized, concurrently controlled, dose expansion phase of the pheNIX trial, which has the potential to be converted to a registrational trial.

All cohorts in the dose-escalation phase showed an acceptable safety profile and certain patients in Cohorts 2 and 3 showed marked Phe reductions. Based on these collective data, Homology has selected two doses for the expansion phase: the mid-dose from Cohort 2 and a dose between the doses in Cohorts 2 and 3. *The Company believes the latter dose has the potential to improve Phe reductions while reducing steroid exposure that was required at the high-dose*. The Company believes that advancing two doses in parallel provides the potential to convert to a registrational trial quickly with the optimal dose as the expansion phase does not include staggered dosing between patients.

(emphasis added)

125.   The statements identified above in emphasis were false and/or materially misleading. Defendants disclosed that the toxicity suffered by the patients in Cohorts 2 and 3 were treated with "increased steroids when necessary," but concealed that the steroid regimen that Homology had been using was insufficient for patient safety, as evidenced by Patient 5's need for increased levels and types of steroids following her high-dose of HMI-102. Thus, Defendants created the false impression that the

43

pheNIX data collected to date was supportive of advancing into the dose-expansion phase and/or that Homology was in fact ready to commence the dose-expansion phase of the pheNIX study.

126.   Specifically, Patient 5 within Cohort 3 of the pheNIX study received a high-dose of HMI-102. The dose failed to generate an effective response, meaning that it did not lower Patient 5's phenylalanine levels below prespecified levels. Further, the dose prompted a dangerous and unanticipated rise in Patient 5's liver toxicity, which necessitated the use of additional prednisone as well as prescriptions of Decadron. Patient 5's response to HMI-102 demonstrated that the steroid regimen Homology initially intended to use was insufficient for the administration of the drug to patients at the effective, high-dose levels. Thus, contrary to Defendants' statements in the press release, the pheNIX data to date did not support commencement of the dose-expansion phase of the trial.

<u>November 9, 2020 – Quarterly Report</u>

127.   On November 9, 2020, after market close, Homology published its quarterly report on Form 10-Q for fiscal 3Q20. Tzianabos and Smith signed the quarterly report on behalf of Homology.

128.   Homology's quarterly report provided investors with false and/or materially misleading information about the pheNIX study and Homology's ability to convert it into a registrational trial. In pertinent part, the quarterly report stated as follows:

> Safety data from these six patients as of the cutoff date showed HMI-102 was generally well-tolerated, and there were no treatment-related serious adverse events. There was one serious adverse event of Herpes zoster (shingles) assessed by a principal investigator of the pheNIX trial as not related to treatment with HMI-102. There were no clinically significant changes in electrocardiogram or vital signs and no clinical signs of complement activation. ***In Cohorts 2 and 3, Grade 1 and 3 alanine aminotransferases, or ALTs . . . , which are common in adeno-associated virus-based gene therapy, were observed and managed with***

44

*increased steroids when necessary*. Each of the two patients who experienced Grade 3 ALTs had pre-existing underlying immune conditions. An independent data monitoring committee, which provided guidance throughout the pheNIX clinical trial, supported the conclusion that there were no safety concerns related to bilirubin, and that ALT elevations may be associated with reduced therapeutic activity.

. . .

Based on the safety and efficacy results observed in the dose-escalation phase as of the cutoff date, we intend to advance to the randomized, concurrently controlled, expansion phase of the pheNIX trial in early 2021, which has the potential to be converted to a registrational trial. *We have selected two doses for the expansion phase: the mid-dose from Cohort 2 and a dose between the doses in Cohorts 2 and 3, which we believe has the potential to improve Phe reductions while reducing overall steroid exposure*.

(emphasis added)

129.   The statements identified above in emphasis were false and/or materially misleading. Defendants disclosed that the toxicity suffered by the patients in Cohorts 2 and 3 were treated with "increased steroids when necessary," but concealed that the steroid regimen that Homology had been using was insufficient for patient safety, as evidenced by Patient 5's need for increased levels and types of steroids following her high-dose of HMI-102. Thus, Defendants created the false impression that the pheNIX data collected to date was supportive of advancing into the dose-expansion phase and/or that Homology was in fact ready to commence the dose-expansion phase of the pheNIX study, notwithstanding the data showing that the steroid regimen Homology intended to use was insufficient for the administration of the drug to patients at the effective, high-dose levels.

<u>March 11, 2021 – Annual Report</u>

130.   On March 11, 2021, after market hours, Homology published its annual report on Form 10-K for fiscal 2020. Tzianabos and Smith signed the annual report on behalf of Homology.

45

131. Homology's annual report provided investors with false and/or materially misleading information about the pheNIX study and Homology's ability to convert it into a registrational trial. In pertinent part, the annual report stated as follows:

> We are currently in Phase 2 of the pheNIX clinical trial with our first and lead product candidate, HMI-102, a gene therapy for the treatment of adults with phenylketonuria, or PKU. ***In November 2020, we reported positive safety and efficacy clinical data from the dose-escalation phase of the trial***. As of the data cutoff date of October 19, 2020, six patients in the dose-escalation phase of the pheNIX trial had received HMI-102 across three dose cohorts (low-dose Cohort 1, n=2; mid-dose Cohort 2, n=2; high-dose Cohort 3, n=2). The results showed that HMI-102 was generally well-tolerated, and resulted in marked reductions in phenylalanine, or Phe, and the Phe-to-tyrosine, or Tyr, ratio, or the Phe-to-Tyr ratio, at two doses. Phe is a registrable endpoint in PKU, and the Phe-to-Tyr ratio is a clinically relevant diagnostic measurement for PKU. ***Based on the safety and efficacy results observed in the dose-escalation phase, we have selected and advanced two doses to the randomized, concurrently controlled, dose expansion Phase 2 portion of the pheNIX trial, which has the potential to be converted to a registrational trial***. We expect to report initial clinical data from this portion of the trial by the end of 2021.

(emphasis added)

132. The statements identified above in emphasis were false and/or materially misleading. Defendants misrepresented that Part 1 of the pheNIX study generated "positive safety and efficacy clinical data" because they continued to conceal the fact that the steroid regimen Homology initially used was insufficient and its modified steroid regimen posed significant patient safety risks. As a result, Defendants perpetuated the false perception that the Part 1 pheNIX data was positive and supportive of advancing into the Part 2 dose-expansion phase and/or that Homology was, in fact, ready to commence the dose-expansion phase of the pheNIX study. Furthermore, based on the negative data from the pheNIX study, Defendants

Amended Class Action Complaint                    Case No. 2:22-cv-01968-FLA (JPRx)

overstated HMI-102's clinical benefit and future prospects by misrepresenting that there was a potential for the pheNIX study to be converted into a registrational trial.

<u>May 6, 2021 – Quarterly Report</u>

133.   On May 6, 2021, after market hours, Homology published its quarterly report on Form 10-Q for fiscal 1Q21. Tzianabos and Smith signed the annual report on behalf of Homology.

134.   Homology's quarterly report provided investors with false and/or materially misleading information about the pheNIX study and Homology's ability to convert it into a registrational trial. In pertinent part, the quarterly report stated as follows:

> We are currently in Phase 2 of the pheNIX clinical trial with our first and lead product candidate, HMI-102, a gene therapy for the treatment of adults with phenylketonuria, or PKU. ***In November 2020, we reported positive safety and efficacy clinical data from the dose-escalation phase of the trial***. As of the data cutoff date of October 19, 2020, six patients in the dose-escalation phase of the trial had received HMI-102 across three dose cohorts (low-dose Cohort 1, n=2; mid-dose Cohort 2, n=2; high-dose Cohort 3, n=2). The results showed that HMI-102 was generally well-tolerated, and resulted in marked reductions in phenylalanine, or Phe, and the Phe-to-tyrosine, or Tyr, ratio, or the Phe-to-Tyr ratio, at two doses. Phe is a registrable endpoint in PKU, and the Phe-to-Tyr ratio is a clinically relevant diagnostic measurement for PKU. ***Based on the safety and efficacy results observed in the dose-escalation phase, we have selected and advanced two doses to the randomized, concurrently controlled, dose expansion Phase 2 portion of the pheNIX trial, which has the potential to be converted to a registrational trial***. We expect to report initial clinical data from the dose expansion portion of the trial by the end of 2021.

(emphasis added)

135.   The statements identified above in emphasis were false and/or materially misleading. Defendants misrepresented that Part 1 of the pheNIX study generated "positive safety and efficacy clinical data" because they continued to conceal the fact that the steroid regimen Homology initially used was insufficient and its modified

47

steroid regimen posed significant patient safety risks. As a result, Defendants perpetuated the false perception that the Part 1 pheNIX data was positive and supportive of advancing into the Part 2 dose-expansion phase and/or that Homology was, in fact, ready to commence the dose-expansion phase of the pheNIX study. Additionally, Defendants disclosed that the two doses selected for the Part 2 dose expansion portion of the study were based on the safety and efficacy results observed in Part 1 of the study, but concealed that, given the serious safety risks and questionable clinical benefit observed, the study was unlikely to be converted into a registrational trial in part due to the fact that Homology's concomitant steroid regimen continued to be insufficient and pose unreasonable danger to patients.

<u>May 13, 2021 – Conference Call</u>

136.   On May 13, 2021, Homology hosted a conference call with analysts to discuss its operations. Tzianabos, Seymour, and McNeely participated during the call on behalf of Homology.

137.   During the call, Tzianabos provided a description of Homology's progress with respect to the pheNIX study and its dose-expansion phase. In pertinent part, Tzianabos stated as follows:

> So our lead program, our PKU program, which is a gene therapy program, termed HMI-102 is still on track to report initial data from the Phase II expansion part of the trial. We also plan to initiate our HMI-103 editing trial this year. We're very confident in our HMI-102 program, and ***our progress continues to be on track with the Phase II dose expansion of pheNIX***. Physicians and patients continue to be excited by the data, and we've seen impressive Phe reduction, as you know, in the dose escalation part of the trial at the mid and the high dose. ***And we've taken all the learnings from that dose escalation phase and applied that to the dose expansion phase***.

(emphasis added)

138.   Later in the call, Tzianabos responded to analyst questions concerning Homology's "steroid dosing" in the pheNIX study. In pertinent part, Tzianabos and Seymour stated as follows:

<Robert Cummins Hazlett BTIG, LLC>: Thank you for the interesting presentation. And two just, I guess, more general questions. One is you've had some learnings with 102 in the clinic. With regard to steroid dosing and managing the individual patients. Do you see applications for what you've learned with the 102 program as you move into the clinic with the other ones? And could be -- give us a little bit of specifics with regard to those learnings, what you tend to take forward?

<Arthur O. Tzianabos>: Yes. Bert, it's Arthur. I'll start and [Seymour] can jump in, but there has been a lot of learnings. Obviously, this is the first ever PKU gene therapy trial here. But it does have broad applicability, these learnings across our platform. And given that we're using AAVHSC15 for this program, 102, but also the gene editing program, obviously, having the same capsid and the safety profile established is going to be really important going forward.

***And you're right, the learnings around the administration of steroids and how we do that and the changes we've made really are paying dividends for us.*** But those learnings absolutely can be applied across our platform. Do you have anything to add, sir?

<Albert Seymour>: No, that's perfect.

<Arthur O. Tzianabos>: All right, [Seymour] is good.

. . .

<Michelle Lim Gilson Canaccord Genuity>: Congratulations on the presentations this week. Yes, for my first question, can you give us any color around the Phase I/II HMI-102 trial in terms of just sort of the changes that you guys made in enrollment and the steroid optimization? And just, I guess, how manageable that has been in terms of running that trial as you go out to a broader group of physicians? I think you mentioned adding additional sites. And if there's maybe any preference around the dose that you're seeing.

. . .

49

<Arthur O. Tzianabos>: Yes, sure. And I'll start out with 102. And so really, the learnings, ***one of the key learnings is the steroid regimen. We started with the prophylactic regimen out of the gate***, as you recall, Michelle. And that seems to be what everybody is doing now. ***One of the things we've done is to keep that top dose of steroids for a longer period of time***. And that really has made a huge difference in terms of what we're seeing. So good progress there.

(emphasis added)

139.   The statements identified above in emphasis were false and/or materially misleading. They indicated that Homology had actually seen success with the modified steroid regimen, which was not the case. Defendants also disclosed that they started Part 1 of the study with a "prophylactic regimen" and decided to keep that top dose of steroids for a longer period of time in Part 2. However, Defendants concealed that their initial steroid regimen was inadequate and their modified approach of increasing steroids continued to pose severe safety risks for patients, thereby reducing the clinical benefit of HMI-102. Taken together, these statements enabled Defendants to deceive the market as to the efficacy, safety, and risks of Homology's steroid regimens.

<u>June 15, 2021 – Conference Call</u>

140.   On June 15, 2021, Homology hosted a conference call with analysts to discuss its operations. Tzianabos participated during the call on behalf of Homology.

141.   During the call, Tzianabos provided a description of Homology's progress with respect to the pheNIX study and its dose-expansion phase. In pertinent part, Tzianabos stated as follows:

<Jason Eron Zemansky BofA Securities>:Can you talk a little bit about some of the updates regarding the protocol design and patient selection, the learnings from kind of the previous results? And looking forward, what makes you think you can get to the strong results we've seen in a broader array of patients?

<Arthur O. Tzianabos>: Yes, it's a great question. And we did as the first gene therapy for PKU ever, we did learn a lot during the dose escalation

50

part of the trial, which is common in a Phase I/II setting for rare disease. And one of the key learnings that we came across is really getting the immunosuppression protocol right. And what we understand now is that *we need to beef up a little bit at the front end, the prophylactic steroid regimen*, which companies are moving to now.

(emphasis added)

142.   The statements identified above in emphasis were false and/or materially misleading. Defendants disclosed the need to "beef up" their steroid regimen but concealed that the initial prophylactic steroid regimen at, potentially, the most efficacious dose had failed and/or was continuing to result in elevated toxicity levels. Defendants created a false impression in the market that Homology sufficiently changed its steroid regimen to account for problems encountered in the study.

<u>August 12, 2021 – Quarterly Report</u>

143.   On August 12, 2021, after market hours, Homology published its quarterly report on Form 10-Q for fiscal 2Q21. Tzianabos and Smith signed the quarterly report on behalf of Homology.

144.   Homology's quarterly report provided investors with false and/or materially misleading information about the pheNIX study and Homology's ability to convert it into a registrational trial. In pertinent part, the quarterly report stated as follows:

We are currently in Phase 2 of the pheNIX clinical trial with our first and lead product candidate, HMI-102, a gene therapy for the treatment of adults with PKU. ***In November 2020, we reported positive safety and efficacy clinical data from the dose-escalation phase of the trial***. As of the data cutoff date of October 19, 2020, six patients in the dose-escalation phase of the trial had received HMI-102 across three dose cohorts (low-dose Cohort 1, n=2; mid-dose Cohort 2, n=2; high-dose Cohort 3, n=2). The results showed that HMI-102 was generally well-tolerated, and resulted in marked reductions in phenylalanine, or Phe, and the Phe-to-tyrosine, or Tyr, ratio, or the Phe-to-Tyr ratio, at two doses. Phe is a registrable endpoint in PKU, and the Phe-to-Tyr ratio is a clinically relevant diagnostic measurement for PKU. ***Based on the safety and efficacy results observed in the dose-escalation phase, we***

51

> ***have selected and advanced two doses to the randomized, concurrently
> controlled, dose expansion Phase 2 portion of the pheNIX trial, which
> has the potential to be converted to a registrational trial***. We expect to
> report initial clinical data from the dose expansion portion of the trial by
> the end of 2021.

(emphasis added)

145.   The statements identified above in emphasis were false and/or materially

misleading. Defendants disclosed that their dose selection for Part 2 was based on the

safety and efficacy results observed in Part 1 of the study, yet concealed the fact that

it would be unlikely for the pheNIX study to be converted into a registrational trial

considering the serious safety risks and questionable clinical benefit observed in Part

1.

<u>October 12, 2021 – Press Release</u>

146.   On October 12, 2021, at 7:00am ET, Homology issued a press release

titled *Homology Medicines Announces Presentations Across Gene Therapy and Gene
Editing Programs, including GTx-mAb, at European Society of Gene & Cell Therapy
Meeting*.

147.   Homology's press release provided investors with false and/or materially

misleading information about HMI-102 and the pheNIX study. In pertinent part, the

press release stated as follows:

> Homology also announced today an update from its ongoing Phase 2
> pheNIX clinical trial evaluating HMI-102 gene therapy in adults with
> PKU. As of September 30, 2021, ***both doses in the trial have been
> generally well-tolerated and have shown evidence of biological activity,
> including clinically meaningful reductions in Phe levels, increases in
> Tyr and reductions in the Phe-to-Tyr ratio***. Several new clinical trials
> sites have also recently been added to pheNIX for a total of 13 with more
> sites expected shortly. Despite increased interest, enrollment is slower
> than anticipated due in part to COVID-19 resurgence, and the Company
> anticipates providing a more detailed pheNIX update in mid-2022 when
> it expects to have a larger dataset.

(emphasis added)

52

148.   The statements identified above in emphasis were false and/or materially misleading. Defendants disclosed that both doses in Part 2 of the study were well-tolerated but concealed the fact that their steroid regimen was insufficient and had already been modified in Homology's other clinical studies; specifically, the pheEDIT study. Accordingly, Defendants created a false impression in the market as to the safety and efficacy of Homology's initial steroid regimen that concealed its need for additional modification and the risks it posed in terms of delaying the advancement of HMI-102.

<u>November 8, 2021 – Conference Call</u>

149.   On November 8, 2021, Homology hosted a conference call with analysts to discuss its operations. Tzianabos participated during the call on behalf of Homology.

150.   During the call, Tzianabos provided a description of Homology's progress with respect to the pheNIX study and its dose-expansion phase. In pertinent part, Tzianabos stated as follows:

> And so our lead program is called HMI-102, this is the gene therapy program. It's the pheNIX trial. We've reported out, we've had 2 data readouts here. The first part of this trial was a Phase I dose escalation to try to find the right dose to move forward to a dose expansion phase. ***We saw a very good safety profile with these vectors, we tested out at 3 doses, the middle and the top dose showed biologic activity***. And by that, I mean a reduction in phenylalanine as well as an increase in tyrosine, which is what you want to see in these patients. We chose those 2 doses to take forward into a dose expansion phase, and we plan to have an update on that data set by the middle of next year in 2022. So really good data. And on the heels of that data, we had an investment from Pfizer in terms of supporting these programs, and that was about a year ago or so.
>
> A little bit about the pheNIX trial. This is the expansion phase. So there's 3 arms here. There's the middle dose that we selected. There will be 6 to 8 patients there. There will be 6 to 8 patients in the high dose as well as concurrent control with 3 to 4 patients there. So this is a single IV administration. ***We have a prophylactic steroid regimen here that's been***

Amended Class Action Complaint                    Case No. 2:22-cv-01968-FLA (JPRx)

***very successful in mitigating any kind of untoward safety profile*** such as increases in bilirubin, innate immune activation, platelet activation. ***We have seen none of that to date and the data that we've announced so far***. And the endpoint here is really a mean change in baseline phenylalanine and secondary endpoints focused on incidence of plasma fee concentrations, change in diet as well as neuro-cog evaluation.

(emphasis added)

151.    The statements identified above in emphasis were false and/or materially misleading. Defendants disclosed a successful utilization of the prophylactic steroid regimen but concealed the truth of the insufficiency of that steroid regimen, its need for modification (similar to what was already in place for the pheEDIT trial), and the safety issues that had materialized during the study to date. Defendants created a false impression in the market that their steroid regimen not only worked, but also was successful in mitigating any untoward safety profile.

<u>November 15, 2021 – Quarterly Report</u>

152.    On November 15, 2021, before market hours, Homology published its quarterly report on Form 10-Q for fiscal 3Q21. Tzianabos and Smith signed the quarterly report on behalf of Homology.

153.    Homology's quarterly report provided investors with false and/or materially misleading information about the pheNIX study and Homology's ability to convert it into a registrational trial. In pertinent part, the quarterly report stated as follows:

***In November 2020, we reported positive safety and efficacy clinical data from the dose-escalation phase of the trial***. As of the data cutoff date of October 19, 2020, six patients in the dose-escalation phase of the trial had received HMI-102 across three dose cohorts (low-dose Cohort 1, n=2; mid-dose Cohort 2, n=2; high-dose Cohort 3, n=2). The results showed that HMI-102 was generally well-tolerated, and resulted in marked reductions in Phe and the Phe-to-tyrosine, or Tyr, ratio, or the Phe-to-Tyr ratio, at two doses. Phe is a registrable endpoint in PKU, and the Phe-to-Tyr ratio is a clinically relevant diagnostic measurement for PKU. ***Based on the safety and efficacy results observed in the dose-***

54

*escalation phase, we have selected and advanced two doses to the randomized, concurrently controlled, dose expansion Phase 2 portion of the pheNIX trial*, which has the potential to be converted to a registrational trial.

In October 2021, we announced that, as of September 30, 2021, ***both doses in the trial have been generally well-tolerated and have shown evidence of biological activity, including clinically meaningful reductions in Phe levels, increases in Tyr and reductions in the Phe-to-Tyr ratio***. In addition, several new clinical trials sites have been recently added to the trial for a total of 13 with more sites expected shortly, and we have expanded our Medical Affairs, Clinical Development and Clinical Operations teams to support pheNIX and our other ongoing clinical trials. Despite increased interest, enrollment is slower than anticipated due in part to a COVID-19 resurgence. We expect to provide a more detailed pheNIX clinical trial update by the middle of 2022 when we expect to have more patients enrolled in the trial.

(emphasis added)

154.   The statements identified above in emphasis were false and/or materially misleading. Defendants disclosed that the two doses selected for the Part 2 dose expansion portion of the study were based on the safety and efficacy results observed in Part 1 of the study, however, they concealed that the Part 1 safety and efficacy data did not support their progression into Part 2 of the study. Defendants also disclosed that both doses in Part 2 of the study were well-tolerated and demonstrated meaningful reductions in phenylalanine levels but concealed the fact that HMI-102 was barely efficacious, Homology's initial steroid regimen was insufficient, and Homology knew that the pheNIX study steroid regimen would need to be modified given the insufficiencies and dangers exhibited to date. As such, Defendants deceived the market by creating a false impression that the Part 1 data supported advancement into Part 2, that Homology's existing steroid regimen was effective and safe, and no additional modifications to the steroid regimen was needed, notwithstanding the fact that an approved modified steroid regimen was already in use for the pheEDIT trial.

Amended Class Action Complaint                    Case No. 2:22-cv-01968-FLA (JPRx)

<u>January 28, 2022 – Conference Call</u>

155.   On January 28, 2022, Homology hosted a conference call with analysts to discuss its operations. Tzianabos and Seymour participated during the call on behalf of Homology.

156.   During the call, Seymour and Tzianabos provided a description of Homology's progress with respect to the pheNIX study and its dose-expansion phase. In pertinent part, Seymour and Tzianabos stated as follows:

> <Jack Kilgannon Allen Robert W. Baird & Co.>: Got it. Sorry, just one brief follow-up on that remark. I guess, as you think about the doses you're bringing into the clinic, are they thought to be therapeutic doses from the -- I guess, the first cohort? Or are you, I guess, starting with more of a subtherapeutic safety dose and then moving forward from there?
>
> <Albert Seymour>: Yes. So I'll start with 103. So 103, we are actually starting with the dose and for all gene therapy actually because it's onetime gene therapy, onetime administration. We are projecting that all of the starting dose for 103 and 203 would have a potential for benefit as they go into those subjects. And for 103, we were able to combine the data both from our preclinical data as well as what we've learned from HMI-102 with that dose. So we're starting in the mid-E13 vector genomes per kilogram with 103 and 203 and 203 that projected dose again is expected to have a potential for benefit based on preclinical data.
>
> <Arthur O. Tzianabos>: Yes. And Jack, it's Arthur. I think it's a testament, as Albert alluded to, to the safety profile we're seeing with 102 and the fact that we're using the same vector capsid anyway for 103. ***So the FDA in a time of intense and this is a point I was going to make at the end of the call at a time where the FDA is pretty much at its peak in terms of regulation of AAV gene therapy based on some of the safety events that have happened in the field in midst of that, we've got 2 cleared INDs that sailed through the FDA. That's a tribute to the quality of the vector and the manufacturing that we have, but it also speaks to the safety of our vectors***. So I think our ability to start higher than we were able to in 102 really is attributable to that.

(emphasis added)

157.   The statements identified above in emphasis were false and/or materially misleading. Defendants disclosed that Homology's vector was safe, given the FDA's

56

heightened regulation of AAV gene therapy, yet concealed the dangers and risks that materialized during the pheNIX study. At the time these statements were made, just three weeks prior to the FDA's clinical hold on the study, Defendants were in possession of the very data that the FDA considered in its determination to halt the study. Defendants knew that the pheNIX study data revealed serious risks and dangers, which could necessitate a clinical hold. Rather than disclosing the true risks associated with the pheNIX study, Defendants touted their FDA clearance as a demonstration of safety and quality while simultaneously concealing the negative study data that would prompt the FDA to place a clinical hold on the study. Consequently, this maintained the false perception Defendants created in the market as to the safety, efficacy, and risks that were present in the pheNIX study until the truth was fully revealed on February 18, 2022, *i.e.*, the day Homology announced the FDA's clinical hold.

*        *        *

158.   Throughout the Class Period, Defendants cultivated an image of being a cutting-edge gene therapy company with a lead product candidate, HMI-102, that was safe, effective, and likely to reach commercialization. Defendants consistently made positive characterizations of HMI-102 and the pheNIX study even though they were in possession of negative data that directly cut against that positive information. In reality, HMI-102's efficacy was equivocal and the risks and dangers associated with Homology's steroid regimens eliminated its clinical benefit, thereby resulting in a study that was unlikely to be converted to a registrational trial and a gene therapy unlikely to see the light of commercialization. By concealing negative data, Defendants were able to mislead investors as to the true risks and dangers that emerged during Parts 1 and 2 of the study thereby maintaining investor enthusiasm for HMI-102 and Homology shares. As corrective disclosures began to reveal the truth to the market, Defendants continued to mislead the investing public by concealing the

57

negative data that would ultimately lead the FDA to placing a clinical hold on the study.

159.   The negative information that was published in Facebook posts by Patient 5 proved that Homology was having serious, unanticipated problems with its steroid regimen and there were significant dangers to patient safety. Instead of truthfully addressing the negative implications of the Facebook information, Defendants reached out to sell-side analysts claiming that, in spite of the negative data revealed on Facebook, nothing fundamentally changed for FIXX. To the contrary, the "fundamental[s]" for Homology, the pheNIX study, and HMI-102 had, in fact, "changed" materially. Thus, when Defendants' misrepresentations were disseminated by analysts, it facilitated the artificial inflation of Homology's stock price and materially misled investors.

160.   On November 6, 2020, when Defendants published the data from Part 1 of the study, the market promptly digested the implications of the negative data that was disclosed and Homology's stock price dramatically declined. This corrective disclosure removed some of the prior artificial inflation in Homology's stock price causing substantial damages to Plaintiffs and Class Members. However, unbeknownst to investors, Defendants misrepresented that the data from Part 1 of the study supported progression to Part 2 and/or that Homology was ready to commence Part 2 of the study. Defendants proceeded to then conceal the fact that Homology's initial steroid regimen was insufficient and its modified approach of administering increased steroids posed significant risks and dangers. This enabled Homology's stock price to remain artificially inflated until Homology announced the FDA's clinical hold on February 18, 2022, at which point Plaintiffs and Class Members suffered significant additional losses.

## VI.   SCIENTER

161.   Defendants acted with scienter, *i.e.*, intent to defraud or deliberate recklessness, when making the above statements about the pheNIX trial and HMI-102 to the public. The following allegations demonstrate that Defendants concealed from investors a number of then-existing facts that materially contradicted the statements they were making and prevented investors from understanding the true risks concerning Homology's pheNIX trial and HMI-102's development.

<u>Contemporaneous Knowledge of Falsity</u>

162.   Defendants had in their possession at all relevant times during the Class Period the material, adverse information concerning Patient 4's and Patient 5's pheNIX trial data. The pheNIX trial was an "open-label" study, meaning that both the researchers and participants were aware of the treatment being administered. Further, based on the trial protocol for the pheNIX study, Homology received phenylalanine measurements as they were taken in order to monitor HMI-102's efficacy and safety.

163.   As a result of Homology's possession of the trial data, Defendants knew at all relevant times that Patient 4 had failed to show a dose-response while also suffering from dangerous liver toxicity. Similarly, Defendants also knew that Patient 5 received the first high-dose of HMI-102 as part of Cohort 3 in the pheNIX trial, that HMI-102 did not result in a dose-response for Patient 5 or otherwise lower Patient 5's phenylalanine levels to meet the primary endpoint for the study, and that HMI-102 produced a dangerous rise in Patient 5's liver toxicity levels.

164.   Defendants' knowledge of Patient 4's pheNIX trial data is evidenced by the fact that Homology dosed Patient 4 between December 2 and 17, 2019, *i.e.*, between the data cut-off deadline and the data presentation. Patient 4's phenylalanine measurements, according to Homology's November 2020 data presentation, show that each of Patient 4's measurements (except for Week 1) demonstrated an elevated or unchanged phenylalanine measurement.

165.   Similarly, Defendants' knowledge of Patient 5's pheNIX trial data is evidenced by the fact that McNeely was aware of the Facebook post in which Patient 5 described her response to HMI-102 and recounted her conversations with clinicians at Homology's investigation site at the Ann & Robert H. Lurie Children's Hospital of Chicago in Chicago, Illinois, under the care of Dr. Barbara K. Burton. As previously alleged, McNeely's email dated April 16, 2020 to the Oppenheimer analyst Matthew Biegler made explicit reference to Patient 5's Facebook post, thereby demonstrating her possession of, and familiarity with, the information contained within it.

166.   While in possession of the information contained within Patient 5's Facebook post, McNeely and other Defendants made contradictory public statements to analysts and investors through emails, SEC filings, press releases, and conference calls that created the false and/or materially misleading impression that the pheNIX study data demonstrated a clinical benefit for HMI-102, efficacious results, a positive safety profile, and support for advancing the pheNIX trial to the dose-expansion phase which, in turn, could be converted into a registrational trial with the FDA.

167.   The fact that Defendants made these false and/or materially misleading statements while in possession of the material, adverse information concerning Patient 5's response to HMI-102 gives rise to a strong, cogent and compelling inference of scienter.

168.   Additionally, Defendants made false and/or materially misleading statements about the dose-expansion phase of the pheNIX trial while knowing that the modifications Homology had made to the steroid regimen for the dose-expansion phase were insufficient in terms of preventing adverse safety events.

169.   Defendants modified the steroid regimen initially after completing the dose-escalation phase of the trial by incorporating the use of rescue steroids, *i.e.*, longer post-infusion immunosuppression treatment. However, this was not sufficient to protect patients from dangerous toxicity outcomes. Defendants knew this, as

60

evidenced by Tzianabos' statement during the June 15, 2021 conference call admitting that "we need to beef up a little bit at the front end, the prophylactic steroid regimen."

170.   When the FDA implemented a clinical hold over the pheNIX trial in February 2022, Defendants ultimately responded by adding an immunosuppressive course of steroids involving the use of a T-cell inhibitor. This was the steroid regimen that Homology had previously incorporated into the trial protocol for pheEDIT, which was approved by the FDA in October 2021. It was also the steroid regimen used by industry peers, such as Rocket Pharmaceuticals and Freeline Therapeutics.

171.   In early September 2021, the FDA held an Advisory Committee meeting to discuss toxicity risks and safety in adeno-associated virus vectors for gene therapy treatments. After the meeting, analysts noted the tightening regulatory environment for gene therapy treatments, including HMI-102. For example, on September 8, 2021, BTIG noted additional "FDA Concern" in its report titled *As Serious Challenges Arise for BioMarin, Homology Continues Forward with Solid Tox Data for its Programs*. In pertinent part, BTIG wrote: "FDA's Cellular, Tissue and Gene Therapies Advisory Committee recently held a meeting contemplating the safety of AAV gene therapies, which among other elements, discussed the potential for AAV vectors, especially those at high doses, which employ various enhancers/promoters, to integrate or insert into the mouse genome and lead to oncogenicity in the liver. Though it is not clear how relevant these findings are to AAV vector consideration in humans for multiple reasons, concern, especially in certain circumstance such as with patients with liver disease (NASH, HepB, etc) was noted."

172.   Following the FDA's Advisory Committee meeting, a clinical hold was issued on a trial being conducted by one of Homology's competitors, BioMarin Pharmaceutical, Inc. BioMarin's drug was BMN 307, which was another adeno-associated virus vector similar to HMI-102. The FDA's clinical hold on BMN 307

Amended Class Action Complaint                    Case No. 2:22-cv-01968-FLA (JPRx)

was precipitated by updated preclinical data showing an increased risk of liver cancer in mice.

173.   Defendants knew that the steroid regimen being used in the pheNIX trial was different and less effective than the one approved for the pheEDIT trial, yet concealed the risks that it posed to investors in terms of worsening regulatory headwinds. Their conduct in this regard gives rise to a strong inference of scienter concerning the false and/or materially misleading statements they made about the dose-expansion phase of the pheNIX study.

<u>Attempt to Conceal</u>

174.   Defendants' scienter is further evidenced by their attempt to conceal the information contained in Patient 5's Facebook posts. Within a few hours of Patient 5 posting her April 15, 2020 post, the post was either taken down or made private so that the public could not view it. Patient 5 had previously been public and completely transparent with her posts and details about treatment. The removal of the April 15, 2020 post marked an abrupt change in conduct, which was likely the result of explicit directives from Homology and/or its agents and employees.

175.   Once the post was removed from public view, McNeely and others at Homology (including the named John Does) proceeded to materially downplay the adverse information shared by Patient 5 in private conversations with sell-side analysts. McNeely, in particular, concealed the material adverse information that had previously been shared by Patient 5 by telling analysts at Oppenheimer and Baird that, for example, there had been no "fundamental change[]" for Homology and the pheNIX data even though McNeely knew this was untrue.

176.   The effort to conceal, cover-up, and downplay the material, adverse information about the pheNIX study data and HMI-102 demonstrates intent on the part of Defendants and, therefore, strengthens the alleged inference of scienter.

Amended Class Action Complaint                    Case No. 2:22-cv-01968-FLA (JPRx)

Corporate Motive

177.   Defendants raised over $240 million while in possession of materially adverse, non-public information that contradicted the public statements they were making to investors.

178.   Homology first negotiated a deal with Pfizer for $60 million in January 2021. It then conducted a follow-on offering selling stock to the public for net proceeds of $49.7 million. Then, at the very end of the Class Period, Homology closed a deal with Oxford Biomedica for $130 million that extended its cash runway into the future for an additional two years.

179.   Homology's deal with Oxford Biomedica, in particular, bolsters an inference of scienter on the part of Defendants. At that point, Defendants had recently delayed the announcement of the pheNIX data from the dose-expansion phase of the trial. Although investors were unaware of it at the time, Defendants knew internally that the trial was at risk due to the dangerous steroid regimen that it had been prescribing patients.

180.   Instead of changing the protocol voluntarily, Defendants concealed the truth about the steroid regimen long enough to close the deal with Oxford Biomedica and ensure that it would have enough cash to further its drug candidate pipeline without having to access the capital markets under adverse conditions.

181.   As of the end of 3Q21, Homology had enough cash, cash equivalents, and short-term investments to continue operations through 1Q23, according to analyst estimates. Thus, it was imperative for Defendants to secure funds to ensure that it stayed a going concern and avoid any going concern qualifications in the imminent future, especially in light of the termination of Homology's collaboration agreement with Novartis Institutes for BioMedical Research, Inc. ("Novartis"). Indeed, with Novartis' termination of the agreement on February 26, 2021, Homology lost the opportunity to realize approximately $270 million in development milestone

payments. Prior to the cancellation, Homology had received $50 million from Novartis.

182.   Homology's need for working capital surpassed that of the average corporation, primarily due to the absence of collaboration deals (*e.g.*, Novartis) combined with its burgeoning research and development expenses. In fact, Homology's net losses for the years ended December 31, 2021 and 2020 were $95.8 million and $128.7 million, respectively. As of December 31, 2021 and December 31, 2020, Homology had an accumulated deficit of $424.1 million and $328.4 million, respectively. For the sake of comparison, Homology had not generated any revenue from product sales to date.

183.   Homology also faced significant obligations in terms of licensing fees under its agreements with City of Hope Medical Center and California Institute of Technology. Pursuant to its agreement with City of Hope Medical Center, Homology had already paid over $4.5 million in sublicensing revenue and was required to pay an annual license maintenance fee; up to a total of $3.2 million in potential milestone fees; a royalty in the low single-digit percentages on net sales of licensed products or services, subject to certain reductions in certain circumstances, with a certain annual minimum royalty; and low double-digit percentages of sublicensing revenues.

184.   Similarly, pursuant to its agreement with the California Institute of Technology, Homology was required to pay up to a total of $7.2 million in milestone payments for the first licensed product; royalties, in the low single-digit percentages on net sales of licensed products, subject to a certain annual minimum royalty; and mid to high single-digit percentages of sublicensing revenues. Homology's payment obligations extended for years into the future, potentially lasting 10 years after the first commercial sale of HMI-102.

Amended Class Action Complaint                    Case No. 2:22-cv-01968-FLA (JPRx)

185. Defendants' deception during this period demonstrates intent on their part and, in turn, scienter in connection with the false and/or materially misleading statements they made during the Class Period.

Core Operations

186. Defendants cannot credibly dispute knowledge of the materially adverse, non-public information that contradicted their public statements about HMI-102 and the pheNIX study due to the fact that HMI-102 was Homology's lead drug candidate and the pheNIX study was integral to its plan to commercialize the drug, *i.e.*, Homology intended to convert the pheNIX study into a registrational trial for FDA application purposes.

187. Analysts routinely focused on HMI-102 as the main driver behind Homology's value. For example, on May 17, 2021, Canaccord Genuity described HMI-102 and the success of the pheNIX study in pertinent part, as follows:

> While we are encouraged by progress in the pipeline and prioritization of HMI-103 PKU gene editing and HMI-203 gene therapy for Hunter syndrome programs, *we continue to focus on clinical-stage HMI-102 PKU gene therapy as the primary driver for FIXX shares*. Homology reiterated guidance for data by YE21E for phase 1/2 study of HMI-102 in adults with PKU. ***Key to these data will be establishing an effective HMI-102 dose*** (6E13 vg/kg or 8E13 vg/kg), and ***validating corticosteroid regimen*** and exclusion criteria (hyperimmune conditions) to manage immunogenicity. Given the modularity of Homology's manufacturing, optimizing dose protocol for AAVHSC15 will be key to unlocking pipeline potential in our view.

(emphasis added)

188. The success of HMI-102 and the pheNIX trial was therefore paramount within Homology and essential to each of the Individual Defendants. Thus, Defendants cannot credibly dispute their knowledge of the adverse facts alleged herein.

Corporate Scienter

189.   Homology's public statements about HMI-102 and the pheNIX trial were critical to its reputation and overall operations. Given the dramatic allegations of falsity contained herein, a strong inference exists that Homology's corporate officials knew of the falsity of the statements at the time of publication.

190.   The Individual Defendants (including any John Does) were acting within their normal scopes of employment when making the fraudulent statements described above. Consequently, their scienter is imputed to Homology under the doctrine of *respondeat superior* and common law principles of agency.

## VII.   LOSS CAUSATION/ECONOMIC LOSS

191.   Throughout the Class Period, Defendants made materially misleading statements and omissions, which artificially inflated the price of Homology securities and operated as a fraud or deceit on Class Period purchasers of these securities. As the truth began to emerge, as a result of the corrective disclosures, the prior artificial inflation came out of Homology's stock price and Plaintiffs and other members of the Class suffered foreseeable economic losses, which were proximately caused by Defendants materially misleading the investing public.

192.   The market for Homology's stock was open, well-developed and efficient at all relevant times. Defendants' misrepresentations and omissions created a false impression in the market as to the efficacy and safety of HMI-102, the dangers and risks of the concomitant steroid regimens, the overall clinical benefit demonstrated in the pheNIX trial, Homology's ability to convert the pheNIX trial into a registrational trial, and Homology's ability to commercialize HMI-102. In turn, this caused Homology's shares to be overvalued and artificially inflated during the Class Period.

193.   Reasonably relying on the integrity of the market price for Homology securities and market information relating to the pheNIX trial, Plaintiffs and other

members of the Class purchased or otherwise acquired Homology securities to their detriment as they sustained damages in response to the revelation of corrective information, as discussed below.

194. On April 15, 2020, Patient 5 posted on Facebook the results of her phenylalanine measurements as well as the fact that her liver toxicity had reached dangerous and severe levels. The information contained in Patient 5's Facebook post signaled to investors and analysts that Homology's prior representations about the pheNIX study and HMI-102's efficacy and safety were potentially not entirely accurate.

195. Notwithstanding McNeely's correspondence with sell-side analysts, Patient 5's Facebook post prompted an immediate decline in Homology's stock price as investors evaluated the truthfulness of Defendants' previous statements. Between April 14, 2020 and April 15, 2020, Homology's stock price declined from $19.34 per share to $13.97 per share on unusually heavy volume. This decline in the price of Homology's stock represented dissipation of the artificial inflation in the stock price that had been created and/or maintained by Defendants' fraudulent statements.

196. On August 10, 2020, after market hours, Homology reported its 2Q20 financial results and provided investors with a business update. Absent from Homology's quarterly report or accompanying press release was any further disclosure about the pheNIX trial data, including Patient 4 from Cohort 2 that had missed the previous data cutoff deadline and Patient 5 from Cohort 3 that had been dosed earlier in the year.

197. The absence of any further information concerning the pheNIX data created uncertainty and concern among investors that Homology was hiding negative data the public. Analysts articulated the negative investor sentiment in reports, including Oppenheimer who, in a report titled *PheNIX Readout Delayed, No Quick FIXX in Sight; PT to $27* dated August 10, 2020, wrote in pertinent part that: "We are

uncertain why management elected against providing updated results as previously guided—even without a definitive RP2D [recommended Phase 2 dose]. Management expressed a desire to present a sufficient body of data to determine RP2D, but we acknowledge some investors may interpret the delay as an indication of a safety signal in the high dose cohort or weak durability from the mid-dose cohort."

198.   Homology's disclosures on August 10, 2020, prompted an immediate decline in the price of its stock, as investors began to question the pheNIX data and in particular whether the data was as positive as Defendants represented. Between August 10, 2020 and August 11, 2020, Homology's stock price declined from $12.64 per share to $11.09 per share on unusually heavy volume. This decline in the price of Homology's stock represented dissipation of the artificial inflation in the stock price that had been created and/or maintained by Defendants' fraudulent statements.

199.   On November 6, 2020, Homology presented data from the pheNIX trial at the NECMP annual meeting. While Homology stated that HMI-102's adverse event profile, safety data, and efficacy data "support[ed] advancing to the expansion phase of the trial," it also revealed to investors that HMI-102 was less effective and more dangerous than previously represented. In pertinent part, Homology disclosed that Patient 4 from Cohort 2 and Patient 5 from Cohort 3 did not show a meaningful dose response, *i.e.*, no phenylalanine reductions below 360 μmol/L, and also experienced Grade 3 ALTs.

200.   Homology's presentation on November 6, 2020, constituted a partial corrective disclosure insofar as it partially corrected the false and/or materially misleading statements disseminated to the market prior to that point about the pheNIX data for the patients from Cohorts 2 and 3. The market perceived the information negatively. Indeed, Oppenheimer echoed investor sentiment in a report dated November 8, 2020, which stated, in relevant part, that:

> FIXX [Homology] shares sold off sharply Friday, as ***investors may have been spooked by treatment-induced liver toxicities that appeared to***

> ***abrogate HMI-102's effect in two of four patients treated at potentially efficacious doses***. We have seen this with gene therapies before, and expect that tighter monitoring and earlier use of rescue steroids will improve outcomes.
>
> Non-responders in the mid- and high-dose cohorts (Patients 4 and 5) had ***Grade 3 elevations in liver enzymes following treatment, suggesting a potential immune response to the viral vector***. Going forward, ***Homology plans to tighten the use of steroids to reduce the risk of immune response***. Per management, these changes are in line with other AAV-based therapies currently in development.
>
> The company plans to advance PheNIX into dose expansion cohorts in early 2021, and has selected two doses going forward: 6x1013 vg/kg, and 8x1013 vg/kg, which is less than the highest dose tested during Phase 1 dose escalation (1x1014 vg/kg).

(emphasis added)

201.   Analysts also noted that Homology left some questions "unanswered" concerning the pheNIX data and whether it supported advancement into the dose-expansion phase of the trial. Evercore, for example, noted on November 9, 2020 that "the evolving data for HMI-102 leaves some unanswered questions about being able to identify a regimen" that can be used in the expansion trial that contains proper "dosing, steroids and patient selection." With respect to the steroid regimen, Evercore further noted that "[Homology] will be modifying the steroid regimen to optimize coverage" for the purposes of the dose-expansion phase of the pheNIX trial.

202.   In response to Homology's November 6, 2020 presentation and the curative information it contained, investors reacted accordingly by selling their Homology stock. Between November 5 and 6, 2020, Homology's stock fell from $12 per share to $9.50 per share, a decline of $2.50 per share or 20.8%, on unusually heavy volume. This decline in the price of Homology's stock represented dissipation of the artificial inflation in the stock price that had been created and/or maintained by Defendants' fraudulent statements.

203.   Homology's stock price continued to retain much of its artificial inflation during the Class Period, even after the November 6, 2020 presentation. As alleged above, Homology's disclosures continued to conceal material information about the safety, efficacy, and overall clinical benefit of HMI-102, including in particular the adequacy of the steroid regimen Homology was prescribing with HMI-102 and the risks it presented in terms of advancing the pheNIX study towards a registrational trial.

204.   On April 6, 2021, after market hours, additional corrective information came to light about Homology and its ability to advance the pheNIX study towards a registrational trial when it announced a follow-on offering. The offering was for common stock in the aggregate amount of $50 million. Homology and its underwriter, BITG, priced the offering at $7.58 per share, which was $1.72 per share less than Homology's closing price on April 6, 2021, before the offering was announced. Homology intended to use the net proceeds from the offering to advance the development of HMI-102 and its pheNIX trial.

205.   The announcement of the offering came just over three weeks after Homology's annual report on Form 10-K dated March 11, 2021, which stated that although expenses were expected to increase in "future years in connection with . . . advanc[ing] our Phase 1/2 pheNIX clinical trial with HMI-102," Homology's "existing cash and cash equivalents will enable us to fund our current projected operating expenses and capital expenditure requirements into the third quarter of 2022." Thus, Homology's need to raise cash for the pheNIX trial so shortly after the statements in the annual report signaled to investors and the market in general that Homology faced significant yet undisclosed obstacles in terms of advancing of HMI-102 through the pheNIX trial.

206.   Investors reacted negatively to Homology's announcement of the offering and sold their shares under the belief that material, adverse information

70

existed with respect to the pheNIX study and HMI-102. Between April 6, 2021 and April 7, 2021, Homology's stock price declined from $9.30 per share to $7.18 per share, respectively, on unusually heavy trading volume, representing a decline of 22.7% in the span of just one day. The decline in Homology's stock represented further dissipation of the artificial inflation in the stock price that had been created and/or maintained by Defendants' fraudulent statements

207.  Despite the partial corrective disclosures described above, Defendants' fraudulent statements continued to mislead investors by concealing the truth about HMI-102 and its concomitant steroid regimen. The truth was not fully revealed until Homology's announcement of the FDA's decision to place a clinical hold on the pheNIX trial on February 18, 2022.

208.  On February 18, 2022, after market close, Homology issued a press release disclosing that the FDA placed a clinical hold on the pheNIX trial "due to the need to modify risk mitigation measures in the study in response to observations of elevated liver functions tests." This information starkly contrasted Defendants' previous statements that touted a "well-tolerated" lead drug candidate with "positive" and "encouraging" safety and efficacy data. In fact, this disclosure revealed the very information that Defendants were concealing from investors, which was the risks and dangers of HMI-102, the need to modify its steroid regimen, and its inability to advance the pheNIX trial and commercialize HMI-102.

209.  Homology's disclosure operated as a correction to Defendants' previous false and/or materially misleading statements and omissions during the Class Period and/or a distinct materialization of risks that were concealed by Defendants during the Class Period. Analysts responded accordingly by downgrading Homology's stock to reflect the uncertainty surrounding HMI-102 and the pheNIX study, including RBC. In its report dated February 22, 2022, RBC stated that Homology's "mitigation strategy implemented so far . . . has not been sufficient to spare the [toxicity]" and,

71

therefore, "with mixed efficacy so far, we are stepping to the sidelines awaiting further clarity on potential clinical hold lift and implications to the broader platform/pipeline."

210.   Oppenheimer reported similar concerns. In its report dated February 22, 2022, Oppenheimer reported that the clinical hold was "especially disheartening because Homology had already taken steps to mitigate this issue (switching form rescue to prophylactic steroids)" and downgraded Homology due to additional "considerable risk to PheNIX's next expected readout mid-year because LFTs [toxicity] are well-known to track with treatment failures . . . ."

211.   As the market promptly digested the gravity of this disclosure, it resulted in an immediate, dramatic decline in Homology's stock price. Between February 18, 2022 and February 22, 2022 (the next trading day), Homology's stock price plunged from $3.86 per share to $2.60 per share on unusually heavy volume, representing a decline of $1.26 per share or 32.64%.

212.   Throughout the Class Period, Defendants withheld information that was material to the market's assessment of HMI-102 and its potential for commercialization. Specifically, Defendants withheld material information concerning the efficacy of HMI-102, the dangers and risks associated with the use of steroids, the overall clinical benefit observed in the pheNIX trial, and Homology's ability to complete the pheNIX trial and commercialize HMI-102. To the contrary, Defendants touted "positive" topline data while simultaneously concealing serious risks and safety issues, which Defendants knew or had reason to know. These dangerous risks severely diminished Homology's chances of successfully completing the pheNIX trial, converting it to a registrational trial, and eventually commercializing HMI-102. Investors who purchased Homology securities during the Class Period were deceived as to these risks and the full impact they would have on Homology's business until these very risks materialized through the disclosures detailed above.

213. Defendants' misrepresentations and omissions were the foreseeable, proximate cause of Plaintiffs' and Class Members' damages because the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by Plaintiffs. Inherent in Defendants' misrepresentations and omissions was the foreseeable consequence that any revelation of truth or materialization of concealed risks would lead to a precipitous decline in the value of Homology's shares thereby causing significant economic losses to Plaintiffs and other Class Members.

214. Defendants' wrongful conduct alleged herein was the direct and proximate cause of the economic losses suffered by Plaintiffs and other members of the Class. During the Class Period, Plaintiffs and other Class Members purchased Homology's stock at prices that were artificially inflated by Defendants' materially misleading statements and omissions, and when Defendants' misleading statements were corrected and/or the information alleged herein to have been concealed from the market was revealed, the price of Homology's stock significantly declined, causing Plaintiffs' and Class Members' losses.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE AND *AFFILIATED UTE* DOCTRINE

215. Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

    a.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b.    the omissions and misrepresentations were material;

    c.    Homology securities traded in an efficient market;

    d.    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Homology securities; and

Amended Class Action Complaint    Case No. 2:22-cv-01968-FLA (JPRx)

e. Plaintiffs and the other members of the Class purchased Homology securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

216. At all relevant times, the market for Homology securities was an efficient market for the following reasons, among others:

a. Homology securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

b. as a regulated issuer, Homology filed periodic public reports with the SEC and the NASDAQ;

c. Homology regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Homology was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

217. As a result of the foregoing, the market for Homology securities promptly digested current information regarding Homology from all publicly available sources and reflected such information in the prices of Homology securities. Under these circumstances, all purchasers of Homology securities during the Class Period suffered similar injury through their purchase of Homology securities at artificially inflated prices and a presumption of reliance applies.

218. A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.,* 406 U.S.

128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Homology's business operations, financial prospects, HMI-102, and the pheNIX study – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

219.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

## IX.   NO SAFE HARBOR

220.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein. Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Homology who knew that those statements were false when made.

## X.   CLASS ACTION ALLEGATIONS

221.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who

purchased or otherwise acquired Homology securities between March 12, 2020 and February 18, 2022, inclusive, and were damaged thereby (the "Class"). Excluded from the Class are the Individual Defendants, members of the immediate families of each Defendant, Homology (including its subsidiaries) and its officers and directors at all relevant times, any entity in which any excluded party has or had a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, heirs, successors or assigns of any such excluded party.

222.   The members of the Class are so numerous that joinder of all members is impracticable. Homology securities were actively traded on the NASDAQ throughout the Class Period. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. In addition, the names and addresses of the Class members can be ascertained from records maintained by Homology or its transfer agent. Notice of the pendency of this action can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

223.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class have been similarly affected by Defendants' conduct in violation of federal law that is complained of herein. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

224.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

225.   Common questions of law and fact apply equally to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

Amended Class Action Complaint                    Case No. 2:22-cv-01968-FLA (JPRx)

a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether Defendants misrepresented and/or omitted material facts about Homology and its business, operations, and management;

c.      whether the price of Homology securities was artificially inflated during the Class Period; and

d.      to what extent the members of the Class have sustained damages and the appropriate measure of damages.

226.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## COUNT I

### FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER

### (Against Homology and the Individual Defendants)

227.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

228.   During the Class Period, Homology and the Individual Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not misleading.

229.   Homology and the Individual Defendants violated Section 10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Homology securities during the Class Period.

230.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Homology securities. Plaintiffs and the Class would not have purchased Homology securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Defendants' misleading statements and/or omissions.

231.   As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Homology securities during the Class Period.

## COUNT II

### FOR VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT

### (Against the Individual Defendants)

232.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

233.   During the Class Period, the Individual Defendants participated in the operation and management of Homology, and conducted and participated, directly and indirectly, in the conduct of Homology's business affairs. Because of their senior positions, they knew the adverse non-public information about Homology's operations, finances, HMI-102 and the pheNIX study.

78

234.   As officers and/or directors of a publicly-owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Homology's finances, operations and press releases, and to correct promptly any public statements issued by Homology which had become materially false or misleading.

235.   Because of their positions of control and authority as senior officers, directors, and/or controlling shareholders, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Homology disseminated in the marketplace during the Class Period concerning Homology's sources of revenues, products, finances, HMI-102 and the pheNIX study. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Homology to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Homology within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Homology securities.

236.   Each of the Individual Defendants, therefore, acted as a controlling person of Homology. By reason of their senior management positions and/or being directors or controlling shareholders of Homology, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Homology to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Homology and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

237.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Homology.

Amended Class Action Complaint                Case No. 2:22-cv-01968-FLA (JPRx)

**XI.   PRAYER FOR RELIEF**

238.   Plaintiffs pray for relief and judgment, as follows:

a.      Determining this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as Class representatives, and designating Co-Lead Counsel as Class Counsel;

b.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

c.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.      Awarding such other and further relief as the Court may deem just and proper.

**XII.   JURY DEMAND**

239.   Plaintiffs hereby demand a trial by jury.

Dated:  August 15, 2022               LEVI & KORSINSKY, LLP

_/s/ Adam M. Apton_
Adam M. Apton (SBN 316506)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel.: (213) 985-7290
Email: aapton@zlk.com

POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Tel.: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ LLP
Brenda Szydlo (*admitted pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Tel.: (212) 661-1100
bszydlo@pomlaw.com

*Counsel for Plaintiffs and*
*Co-Lead Counsel for the Class*

PORTNOY LAW FIRM
Lesley F. Portnoy
1800 Century Park East, Suite 600
Los Angeles, CA 90067
Tel.: (310) 692-8883
lesley@portnoylaw.com

*Additional Counsel for Jason Rofeh*

Amended Class Action Complaint                    Case No. 2:22-cv-01968-FLA (JPRx)